(Slip Opinion)      OCTOBER TERM, 2012      1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BAILEY *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 11–770.   Argued November 1, 2012—Decided February 19, 2013

While police were preparing to execute a warrant to search a basement apartment for a handgun, detectives conducting surveillance in an unmarked car outside the apartment saw two men—later identified as petitioner Chunon Bailey and Bryant Middleton—leave the gated area above the apartment, get in a car, and drive away.  The detectives waited for the men to leave and then followed the car approximately a mile before stopping it.  They found keys during a patdown search of Bailey, who initially said that he resided in the apartment but later denied it when informed of the search.  Both men were handcuffed and driven in a patrol car to the apartment, where the search team had already found a gun and illicit drugs.  After arresting the men, police discovered that one of Bailey's keys unlocked the apartment's door.

At trial, the District Court denied Bailey's motion to suppress the apartment key and the statements he made to the detectives when stopped, holding that Bailey's detention was justified under *Michigan* v. *Summers*, 452 U. S. 692, as a detention incident to the execution of a search warrant, and, in the alternative, that the detention was supported by reasonable suspicion under *Terry* v. *Ohio*, 392 U. S. 1. Bailey was convicted.  The Second Circuit affirmed denial of the suppression motion.  Finding that *Summers* authorized Bailey's detention, it did not address the alternative *Terry* holding.

*Held*: The rule in *Summers* is limited to the immediate vicinity of the premises to be searched and does not apply here, where Bailey was detained at a point beyond any reasonable understanding of the immediate vicinity of the premises in question.  Pp. 4−15.

(a) The *Summers* rule permits officers executing a search warrant "to detain the occupants of the premises while a proper search is con-

ducted," 452 U. S., at 705, even when there is no particular suspicion that an individual is involved in criminal activity or poses a specific danger to the officers, *Muehler* v. *Mena*, 544 U. S. 93. Detention is permitted "because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial." *Id.,* at 98. In *Summers* and later cases the detained occupants were found within or immediately outside the residence being searched. Here, however, petitioner left the apartment before the search began and was detained nearly a mile away. Pp. 4–6.

(b) In *Summers,* the Court recognized three important law enforcement interests that, taken together, justify detaining an occupant who is on the premises during the search warrant's execution, 452 U. S., at 702–703. The first, officer safety, requires officers to secure the premises, which may include detaining current occupants so the officers can search without fear that the occupants will become disruptive, dangerous, or otherwise frustrate the search. If an occupant returns home during the search, officers can mitigate the risk by taking routine precautions. Here, however, Bailey posed little risk to the officers at the scene after he left the premises, apparently without knowledge of the search. Had he returned, he could have been apprehended and detained under *Summers.* Were police to have the authority to detain persons away from the premises, the authority to detain incident to the execution of a search warrant would reach beyond the rationale of ensuring the integrity of the search by detaining those who are on the scene. As for the Second Circuit's additional concerns, if officers believe that it would be dangerous to detain a departing individual in front of a residence, they are not required to stop him; and if officers have reasonable suspicion of criminal activity, they can instead rely on *Terry.* The risk that a departing occupant might alert those still inside the residence is also an insufficient safety rationale for expanding the detention authority beyond the immediate vicinity of the premises to be searched.

The second law enforcement interest is the facilitation of the completion of the search. Unrestrained occupants can hide or destroy evidence, seek to distract the officers, or simply get in the way. But a general interest in avoiding obstruction of a search cannot justify detention beyond the vicinity of the premises. Occupants who are kept from leaving may assist the officers by opening locked doors or containers in order to avoid the use of force that can damage property or delay completion of the search. But this justification must be confined to persons on site as the search warrant is executed and so in a position to observe the progression of the search.

The third interest is the interest in preventing flight, which also serves to preserve the integrity of the search. If officers are con-

Syllabus

cerned about flight in the event incriminating evidence is found, they might rush the search, causing unnecessary damage or compromising its careful execution. The need to prevent flight, however, if unbounded, might be used to argue for detention of any regular occupant regardless of his or her location at the time of the search, *e.g.*, detaining a suspect 10 miles away, ready to board a plane. Even if the detention of a former occupant away from the premises could facilitate a later arrest if incriminating evidence is discovered, "the mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment." *Mincey* v. *Arizona*, 437 U. S. 385, 393.

In sum, none of the three law enforcement interests identified in *Summers* applies with the same or similar force to the detention of recent occupants beyond the immediate vicinity of the premises to be searched. And each is also insufficient, on its own, to justify an expansion of the rule in *Summers* to permit the detention of a former occupant, wherever he may be found away from the scene of the search. Pp. 6–12.

(c) As recognized in *Summers,* the detention of a current occupant "represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant," 452 U. S., at 703, but an arrest of an individual away from his home involves an additional level of intrusiveness. A public detention, even if merely incident to a search, will resemble a full-fledged arrest and can involve the indignity of a compelled transfer back to the premises. P. 12.

(d) Limiting the rule in *Summers* to the area within which an occupant poses a real threat to the safe and efficient execution of a search warrant ensures that the scope of the detention incident to a search is confined to its underlying justification. Because petitioner was detained at a point beyond any reasonable understanding of immediate vicinity, there is no need to further define that term here. Since detention is justified by the interests in executing a safe and efficient search, the decision to detain must be acted upon at the scene of the search and not at a later time in a more remote place. Pp. 13−15.

(e) The question whether stopping petitioner was lawful under *Terry* remains open on remand. P. 15.

652 F. 3d 197, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined. SCALIA, J., filed a concurring opinion, in which GINSBURG and KAGAN, JJ., joined. BREYER, J., filed a dissenting opinion, in which THOMAS and ALITO, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

---

No. 11–770

---

## CHUNON L. BAILEY, AKA POLO, PETITIONER *v.* UNITED STATES

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[February 19, 2013]

JUSTICE KENNEDY delivered the opinion of the Court.

The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures. A search may be of a person, a thing, or a place. So too a seizure may be of a person, a thing, or even a place. A search or a seizure may occur singly or in combination, and in differing sequence. In some cases the validity of one determines the validity of the other. The instant case involves the search of a place (an apartment dwelling) and the seizure of a person. But here, though it is acknowledged that the search was lawful, it does not follow that the seizure was lawful as well. The seizure of the person is quite in question. The issue to be resolved is whether the seizure of the person was reasonable when he was stopped and detained at some distance away from the premises to be searched when the only justification for the detention was to ensure the safety and efficacy of the search.

I

A

At 8:45 p.m. on July 28, 2005, local police obtained a warrant to search a residence for a .380-caliber handgun.

The residence was a basement apartment at 103 Lake Drive, in Wyandanch, New York. A confidential informant had told police he observed the gun when he was at the apartment to purchase drugs from "a heavy set black male with short hair" known as "Polo." App. 16–26. As the search unit began preparations for executing the warrant, two officers, Detectives Richard Sneider and Richard Gorbecki, were conducting surveillance in an unmarked car outside the residence. About 9:56 p.m., Sneider and Gorbecki observed two men—later identified as petitioner Chunon Bailey and Bryant Middleton—leave the gated area above the basement apartment and enter a car parked in the driveway. Both matched the general physical description of "Polo" provided by the informant. There was no indication that the men were aware of the officers' presence or had any knowledge of the impending search. The detectives watched the car leave the driveway. They waited for it to go a few hundred yards down the street and followed. The detectives informed the search team of their intent to follow and detain the departing occupants. The search team then executed the search warrant at the apartment.

Detectives Sneider and Gorbecki tailed Bailey's car for about a mile—and for about five minutes—before pulling the vehicle over in a parking lot by a fire station. They ordered Bailey and Middleton out of the car and did a patdown search of both men. The officers found no weapons but discovered a ring of keys in Bailey's pocket. Bailey identified himself and said he was coming from his home at 103 Lake Drive. His driver's license, however, showed his address as Bayshore, New York, the town where the confidential informant told the police the suspect, "Polo," used to live. *Id.*, at 89. Bailey's passenger, Middleton, said Bailey was giving him a ride home and confirmed they were coming from Bailey's residence at 103 Lake Drive. The officers put both men in handcuffs. When

Bailey asked why, Gorbecki stated that they were being detained incident to the execution of a search warrant at 103 Lake Drive. Bailey responded: "I don't live there. Anything you find there ain't mine, and I'm not cooperating with your investigation." *Id.*, at 57, 77.

The detectives called for a patrol car to take Bailey and Middleton back to the Lake Drive apartment. Detective Sneider drove the unmarked car back, while Detective Gorbecki used Bailey's set of keys to drive Bailey's car back to the search scene. By the time the group returned to 103 Lake Drive, the search team had discovered a gun and drugs in plain view inside the apartment. Bailey and Middleton were placed under arrest, and Bailey's keys were seized incident to the arrest. Officers later discovered that one of Bailey's keys opened the door of the basement apartment.

B

Bailey was charged with three federal offenses: possession of cocaine with intent to distribute, in violation of 21 U. S. C. §§841(a)(1) and (b)(1)(B)(iii); possession of a firearm by a felon, in violation of 18 U. S. C. §922(g)(1); and possession of a firearm in furtherance of a drug-trafficking offense, in violation of §924(c)(1)(A)(i). At trial Bailey moved to suppress the apartment key and the statements he made when stopped by Detectives Sneider and Gorbecki. That evidence, Bailey argued, derived from an unreasonable seizure. After an evidentiary hearing the United States District Court for the Eastern District of New York denied the motion to suppress. The District Court held that Bailey's detention was permissible under *Michigan* v. *Summers*, 452 U. S. 692 (1981), as a detention incident to the execution of a search warrant. In the alternative, it held that Bailey's detention was lawful as an investigatory detention supported by reasonable suspicion under *Terry* v. *Ohio*, 392 U. S. 1 (1968). After a trial

the jury found Bailey guilty on all three counts.

The Court of Appeals for the Second Circuit ruled that Bailey's detention was proper and affirmed denial of the suppression motion. It interpreted this Court's decision in *Summers* to "authoriz[e] law enforcement to detain the occupant of premises subject to a valid search warrant when that person is seen leaving those premises and the detention is effected *as soon as reasonably practicable.*" 652 F. 3d 197, 208 (2011). Having found Bailey's detention justified under *Summers*, the Court of Appeals did not address the District Court's alternative holding that the stop was permitted under *Terry*.

The Federal Courts of Appeals have reached differing conclusions as to whether *Michigan* v. *Summers* justifies the detention of occupants beyond the immediate vicinity of the premises covered by a search warrant. This Court granted certiorari to address the question. 566 U. S. \_\_\_ (2012).

## II

The Fourth Amendment, applicable through the Fourteenth Amendment to the States, provides: "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . particularly describing the place to be searched, and the persons or things to be seized." This Court has stated "the general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause" to believe that the individual has committed a crime. *Dunaway* v. *New York*, 442 U. S. 200, 213 (1979). The standard of probable cause, with "roots that are deep in our history," *Henry* v. *United States*, 361 U. S. 98, 100 (1959), "represent[s] the accumulated wisdom of precedent and experience as to the minimum justification necessary to make the kind of intrusion involved in an arrest 'reasonable' under the

Fourth Amendment." *Dunaway*, *supra*, at 208.

Within the framework of these fundamental rules there is some latitude for police to detain where "the intrusion on the citizen's privacy 'was so much less severe' than that involved in a traditional arrest that 'the opposing interests in crime prevention and detection and in the police officer's safety' could support the seizure as reasonable." *Summers*, *supra,* at 697–698 (quoting *Dunaway*, *supra*, at 209); see also *Terry*, *supra,* at 27 (holding that a police officer who has reasonable suspicion of criminal activity may conduct a brief investigative stop).

In *Summers*, the Court defined an important category of cases in which detention is allowed without probable cause to arrest for a crime. It permitted officers executing a search warrant "to detain the occupants of the premises while a proper search is conducted." 452 U. S., at 705. The rule in *Summers* extends farther than some earlier exceptions because it does not require law enforcement to have particular suspicion that an individual is involved in criminal activity or poses a specific danger to the officers. *Muehler* v. *Mena*, 544 U. S. 93 (2005). In *Muehler*, applying the rule in *Summers*, the Court stated: "An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" 544 U. S., at 98 (quoting *Summers*, *supra,* at 705, n. 19). The rule announced in *Summers* allows detention incident to the execution of a search warrant "because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial." *Muehler*, *supra*, at 98.

In *Summers* and later cases the occupants detained were found within or immediately outside a residence at the moment the police officers executed the search warrant. In *Summers*, the defendant was detained on a walk leading down from the front steps of the house. See Tr. of

Oral Arg. in O. T. 1980, No. 79–1794, pp. 41–42; see also *Muehler*, *supra*, at 96 (detention of occupant in adjoining garage); *Los Angeles County* v. *Rettele*, 550 U. S. 609, 611 (2007) (*per curiam*) (detention of occupants in bedroom). Here, however, petitioner left the apartment before the search began; and the police officers waited to detain him until he was almost a mile away. The issue is whether the reasoning in *Summers* can justify detentions beyond the immediate vicinity of the premises being searched. An exception to the Fourth Amendment rule prohibiting detention absent probable cause must not diverge from its purpose and rationale. See *Florida* v. *Royer*, 460 U. S. 491, 500 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification"). It is necessary, then, to discuss the reasons for the rule explained in *Summers* to determine if its rationale extends to a detention like the one here.

A

In *Summers*, the Court recognized three important law enforcement interests that, taken together, justify the detention of an occupant who is on the premises during the execution of a search warrant: officer safety, facilitating the completion of the search, and preventing flight. 452 U. S., at 702–703.

1

The first interest identified in *Summers* was "the interest in minimizing the risk of harm to the officers." *Id.*, at 702. There the Court held that "the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence," and "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Id.*, at 702–703.

When law enforcement officers execute a search warrant, safety considerations require that they secure the premises, which may include detaining current occupants. By taking "unquestioned command of the situation," *id.*, at 703, the officers can search without fear that occupants, who are on the premises and able to observe the course of the search, will become disruptive, dangerous, or otherwise frustrate the search.

After *Summers*, this Court decided *Muehler* v. *Mena*. The reasoning and conclusions in *Muehler* in applying the *Summers* rule go quite far in allowing seizure and detention of persons to accommodate the necessities of a search. There, the person detained and held in handcuffs was not suspected of the criminal activity being investigated; but, the Court held, she could be detained nonetheless, to secure the premises while the search was underway. The "safety risk inherent in executing a search warrant for weapons was sufficient to justify the use of handcuffs, [and] the need to detain multiple occupants made the use of handcuffs all the more reasonable." 544 U. S., at 100. While the Court in *Muehler* did remand for consideration of whether the detention there—alleged to have been two or three hours—was necessary in light of all the circumstances, the fact that so prolonged a detention indeed might have been permitted illustrates the far-reaching authority the police have when the detention is made at the scene of the search. This in turn counsels caution before extending the power to detain persons stopped or apprehended away from the premises where the search is being conducted.

It is likely, indeed almost inevitable in the case of a resident, that an occupant will return to the premises at some point; and this might occur when the officers are still conducting the search. Officers can and do mitigate that risk, however, by taking routine precautions, for instance by erecting barricades or posting someone on the perime-

ter or at the door. In the instant case Bailey had left the premises, apparently without knowledge of the search. He posed little risk to the officers at the scene. If Bailey had rushed back to his apartment, the police could have apprehended and detained him under *Summers.* There is no established principle, however, that allows the arrest of anyone away from the premises who is likely to return.

The risk, furthermore, that someone could return home during the execution of a search warrant is not limited to occupants who depart shortly before the start of a search. The risk that a resident might return home, either for reasons unrelated to the search or after being alerted by someone at the scene, exists whether he left five minutes or five hours earlier. Unexpected arrivals by occupants or other persons accustomed to visiting the premises might occur in many instances. Were police to have the authority to detain those persons away from the premises, the authority to detain incident to the execution of a search warrant would reach beyond the rationale of ensuring the integrity of the search by detaining those who are in fact on the scene.

The Court of Appeals relied on an additional safety consideration. It concluded that limiting the application of the authority to detain to the immediate vicinity would put law enforcement officers in a dilemma. They would have to choose between detaining an individual immediately (and risk alerting occupants still inside) or allowing the individual to leave (and risk not being able to arrest him later if incriminating evidence were discovered). 652 F. 3d, at 205–206. Although the danger of alerting occupants who remain inside may be of real concern in some instances, as in the case when a no-knock warrant has been issued, this safety rationale rests on the false premise that a detention must take place. If the officers find that it would be dangerous to detain a departing individual in front of a residence, they are not required to stop

him. And, where there are grounds to believe the departing occupant is dangerous, or involved in criminal activity, police will generally not need *Summers* to detain him at least for brief questioning, as they can rely instead on *Terry*.

The risk that a departing occupant might notice the police surveillance and alert others still inside the residence is also an insufficient safety rationale to justify expanding the existing categorical authority to detain so that it extends beyond the immediate vicinity of the premises to be searched. If extended in this way the rationale would justify detaining anyone in the neighborhood who could alert occupants that the police are outside, all without individualized suspicion of criminal activity or connection to the residence to be searched. This possibility demonstrates why it is necessary to confine the *Summers* rule to those who are present when and where the search is being conducted.

### 2

The second law enforcement interest relied on in *Summers* was that "the orderly completion of the search may be facilitated if the occupants of the premises are present." 452 U. S., at 703. This interest in efficiency derives from distinct, but related, concerns.

If occupants are permitted to wander around the premises, there is the potential for interference with the execution of the search warrant. They can hide or destroy evidence, seek to distract the officers, or simply get in the way. Those risks are not presented by an occupant who departs beforehand. So, in this case, after Bailey drove away from the Lake Drive apartment, he was not a threat to the proper execution of the search. Had he returned, officers would have been free to detain him at that point. A general interest in avoiding obstruction of a search, however, cannot justify detention beyond the vicinity of

the premises to be searched.

*Summers* also noted that occupants can assist the officers. Under the reasoning in *Summers*, the occupants' "self-interest may induce them to open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand." *Ibid.* This justification must be confined to those persons who are on site and so in a position, when detained, to at once observe the progression of the search; and it would have no limiting principle were it to be applied to persons beyond the premises of the search. Here, it appears the police officers decided to wait until Bailey had left the vicinity of the search before detaining him. In any event it later became clear to the officers that Bailey did not wish to cooperate. See App. 57, 77 ("I don't live there. Anything you find there ain't mine, and I'm not cooperating with your investigation"). And, by the time the officers brought Bailey back to the apartment, the search team had discovered contraband. Bailey's detention thus served no purpose in ensuring the efficient completion of the search.

3

The third law enforcement interest addressed in *Summers* was the "the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found." 452 U. S., at 702. The proper interpretation of this language, in the context of *Summers* and in the broader context of the reasonableness standard that must govern and inform the detention incident to a search, is that the police can prohibit an occupant from leaving the scene of the search. As with the other interests identified in *Summers*, this justification serves to preserve the integrity of the search by controlling those persons who are on the scene. If police officers are concerned about flight, and have to keep close supervision of occupants who are not

restrained, they might rush the search, causing unnecessary damage to property or compromising its careful execution. Allowing officers to secure the scene by detaining those present also prevents the search from being impeded by occupants leaving with the evidence being sought or the means to find it.

The concern over flight is not because of the danger of flight itself but because of the damage that potential flight can cause to the integrity of the search. This interest does not independently justify detention of an occupant beyond the immediate vicinity of the premises to be searched. The need to prevent flight, if unbounded, might be used to argue for detention, while a search is underway, of any regular occupant regardless of his or her location at the time of the search. If not circumscribed, the rationale of preventing flight would justify, for instance, detaining a suspect who is 10 miles away, ready to board a plane. The interest in preventing escape from police cannot extend this far without undermining the usual rules for arrest based on probable cause or a brief stop for questioning under standards derived from *Terry*. Even if the detention of a former occupant away from the premises could facilitate a later arrest should incriminating evidence be discovered, "the mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment." *Mincey* v. *Arizona*, 437 U. S. 385, 393 (1978).

In sum, of the three law enforcement interests identified to justify the detention in *Summers*, none applies with the same or similar force to the detention of recent occupants beyond the immediate vicinity of the premises to be searched. Any of the individual interests is also insufficient, on its own, to justify an expansion of the rule in *Summers* to permit the detention of a former occupant, wherever he may be found away from the scene of the search. This would give officers too much discretion. The

categorical authority to detain incident to the execution of
a search warrant must be limited to the immediate vicini-
ty of the premises to be searched.

B

In *Summers*, the Court recognized the authority to
detain occupants incident to the execution of a search
warrant not only in light of the law enforcement interests
at stake but also because the intrusion on personal liberty
was limited. The Court held detention of a current occu-
pant "represents only an incremental intrusion on personal
liberty when the search of a home has been authorized
by a valid warrant." 452 U. S., at 703. Because the deten-
tion occurs in the individual's own home, "it could add only
minimally to the public stigma associated with the search
itself and would involve neither the inconvenience nor the
indignity associated with a compelled visit to the police
station." *Id.*, at 702.

Where officers arrest an individual away from his home,
however, there is an additional level of intrusiveness. A
public detention, even if merely incident to a search, will
resemble a full-fledged arrest. As demonstrated here,
detention beyond the immediate vicinity can involve an
initial detention away from the scene and a second deten-
tion at the residence. In between, the individual will
suffer the additional indignity of a compelled transfer back
to the premises, giving all the appearances of an arrest.
The detention here was more intrusive than a usual de-
tention at the search scene. Bailey's car was stopped; he
was ordered to step out and was detained in full public
view; he was handcuffed, transported in a marked patrol
car, and detained further outside the apartment. These
facts illustrate that detention away from a premises where
police are already present often will be more intrusive
than detentions at the scene.

## C

*Summers* recognized that a rule permitting the detention of occupants on the premises during the execution of a search warrant, even absent individualized suspicion, was reasonable and necessary in light of the law enforcement interests in conducting a safe and efficient search. Because this exception grants substantial authority to police officers to detain outside of the traditional rules of the Fourth Amendment, it must be circumscribed.

A spatial constraint defined by the immediate vicinity of the premises to be searched is therefore required for detentions incident to the execution of a search warrant. The police action permitted here—the search of a residence—has a spatial dimension, and so a spatial or geographical boundary can be used to determine the area within which both the search and detention incident to that search may occur. Limiting the rule in *Summers* to the area in which an occupant poses a real threat to the safe and efficient execution of a search warrant ensures that the scope of the detention incident to a search is confined to its underlying justification. Once an occupant is beyond the immediate vicinity of the premises to be searched, the search-related law enforcement interests are diminished and the intrusiveness of the detention is more severe.

Here, petitioner was detained at a point beyond any reasonable understanding of the immediate vicinity of the premises in question; and so this case presents neither the necessity nor the occasion to further define the meaning of immediate vicinity. In closer cases courts can consider a number of factors to determine whether an occupant was detained within the immediate vicinity of the premises to be searched, including the lawful limits of the premises, whether the occupant was within the line of sight of his dwelling, the ease of reentry from the occupant's location, and other relevant factors.

Confining an officer's authority to detain under *Summers* to the immediate vicinity of a premises to be searched is a proper limit because it accords with the rationale of the rule. The rule adopted by the Court of Appeals here, allowing detentions of a departed occupant "as soon as reasonably practicable," departs from the spatial limit that is necessary to confine the rule in light of the substantial intrusions on the liberty of those detained.

Because detention is justified by the interests in executing a safe and efficient search, the decision to detain must be acted upon at the scene of the search and not at a later time in a more remote place. If officers elect to defer the detention until the suspect or departing occupant leaves the immediate vicinity, the lawfulness of detention is controlled by other standards, including, of course, a brief stop for questioning based on reasonable suspicion under *Terry* or an arrest based on probable cause. A suspect's particular actions in leaving the scene, including whether he appears to be armed or fleeing with the evidence sought, and any information the officers acquire from those who are conducting the search, including information that incriminating evidence has been discovered, will bear, of course, on the lawfulness of a later stop or detention. For example, had the search team radioed Detectives Sneider and Gorbecki about the gun and drugs discovered in the Lake Drive apartment as the officers stopped Bailey and Middleton, this may have provided them with probable cause for an arrest.

## III

Detentions incident to the execution of a search warrant are reasonable under the Fourth Amendment because the limited intrusion on personal liberty is outweighed by the special law enforcement interests at stake. Once an individual has left the immediate vicinity of a premises to be searched, however, detentions must be justified by some

other rationale.  In this respect it must be noted that the District Court, as an alternative ruling, held that stopping petitioner was lawful under *Terry*.  This opinion expresses no view on that issue.  It will be open, on remand, for the Court of Appeals to address the matter and to determine whether, assuming the *Terry* stop was valid, it yielded information that justified the detention the officers then imposed.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 11–770

_____

## CHUNON L. BAILEY, AKA POLO, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[February 19, 2013]

JUSTICE SCALIA, with whom JUSTICE GINSBURG and JUSTICE KAGAN join, concurring.

I join the Court's opinion. I write separately to emphasize why the Court of Appeals' interest-balancing approach to this case—endorsed by the dissent—is incompatible with the categorical rule set forth in *Michigan* v. *Summers*, 452 U. S. 692 (1981).

*Summers* identified several law-enforcement interests supporting the detention of occupants incident to the execution of a warrant to search for contraband, along with several reasons why such detentions are typically less intrusive than an arrest. See *id.*, at 701–704. Weighing those factors, the Court determined that "it is constitutionally reasonable to require [a] citizen to remain while officers of the law execute a valid warrant to search his home." *Id.,* at 705.

The existence and scope of the *Summers* exception were predicated on that balancing of the interests and burdens. But—crucially—whether *Summers* authorizes a seizure *in an individual case* does not depend on any balancing, because the *Summers* exception, within its scope, is "categorical." *Muehler* v. *Mena*, 544 U. S. 93, 98 (2005). That *Summers* establishes a categorical, bright-line rule is simply not open to debate—*Summers* itself insisted on it: "The rule we adopt today does not depend upon such an

ad hoc determination, because the officer is not required to evaluate either the quantum of proof justifying detention or the extent of the intrusion to be imposed by the sei-zure." 452 U. S., at 705, n. 19. Where *Summers* applies, a seizure is *ipso facto* "constitutionally reasonable." *Id.,* at 705.

The question in this case is whether *Summers* applies at all. It applies only to seizures of "occupants"—that is, persons within "the immediate vicinity of the premises to be searched." *Ante,* at 11. Bailey was seized a mile away. Ergo, *Summers* cannot sanction Bailey's detention. It really is that simple.

The Court of Appeals' mistake, echoed by the dissent, was to replace that straightforward, binary inquiry with open-ended balancing. Weighing the equities—Bailey "posed a risk of harm to the officers," his detention "was not unreasonably prolonged," and so forth—the Court of Appeals proclaimed the officers' conduct, "in the circum-stances presented, reasonable and prudent." 652 F. 3d 197, 206 (CA2 2011) (internal quotation marks and brack-ets omitted); see also *post,* at 3–4 (opinion of BREYER, J.). That may be so, but it is irrelevant to whether *Summers* authorized the officers to seize Bailey without probable cause. To resolve that issue, a court need ask only one question: Was the person seized within "the immediate vicinity of the premises to be searched"? *Ante,* at 11.

The Court of Appeals read *Summers*' spatial constraint somewhat more promiscuously: In its view, it sufficed that police observed Bailey "in the process of leaving the prem-ises" and detained him "as soon as practicable." 652 F. 3d, at 206 (emphasis deleted); see also *post,* at 6–7. That has pragmatic appeal; police, the argument runs, should not be precluded from seizing the departing occupant at a distance from the premises if that would be safer than stopping him on the front steps. But it rests on the fallacy that each search warrant *entitles* the Government to a

concomitant *Summers* detention.  Conducting a *Summers* seizure incident to the execution of a warrant "is not the Government's right; it is an exception—justified by necessity—to a rule that would otherwise render the [seizure] unlawful."  *Thornton* v. *United States*, 541 U. S. 615, 627 (2004) (SCALIA, J., concurring in judgment).

It bears repeating that the "general rule" is "that Fourth Amendment seizures are 'reasonable' only if based on probable cause."  *Dunaway* v. *New York*, 442 U. S. 200, 213 (1979).  *Summers* embodies a categorical judgment that *in one narrow circumstance*—the presence of occupants during the execution of a search warrant—seizures are reasonable despite the absence of probable cause.  *Summers* itself foresaw that without clear limits its exception could swallow the general rule: If a "multifactor balancing test of 'reasonable police conduct under the circumstances'" were extended "to cover all seizures that do not amount to technical arrests," it recognized, the "'protections intended by the Framers could all too easily disappear in the consideration and balancing of the multifarious circumstances presented by different cases.'"  452 U. S*.,* at 705, n. 19 (quoting *Dunaway, supra*, at 213 (some internal quotation marks omitted)).  The dissent would harvest from *Summers* what it likes (permission to seize without probable cause) and leave behind what it finds uncongenial (limitation of that permission to a narrow, categorical exception, not an open-ended "reasonableness" inquiry).\*  *Summers* anticipated that gambit and explicitly disavowed the dissent's balancing test.  See 452 U. S., at 705, n. 19 ("[T]he rule we adopt today does not depend

——————

\*The dissent purports to agree "that the question involves drawing a line of demarcation granting a categorical form of detention authority." *Post,* at 3.  What the dissent misses is that a "categorical" exception must be defined by categorical *limits*.  *Summers*' authorization to detain applies only to "occupants"—a bright-line limitation that the dissent's "reasonably practicable" test discards altogether.

upon such an ad hoc determination").

Regrettably, this Court's opinion in *Summers* facilitated the Court of Appeals' error here by setting forth a smorgasbord of law-enforcement interests assertedly justifying its holding, including "preventing flight in the event that incriminating evidence is found" and obtaining residents' assistance in "open[ing] locked doors or locked containers." *Id.,* at 701–703. We should not have been so expansive. The *Summers* exception is appropriately predicated *only* on law enforcement's interest in carrying out the search unimpeded by violence or other disruptions. "The common denominator" of the few Fourth Amendment doctrines permitting seizures based on less than probable cause "is the presence of some governmental interest independent of the ordinary interest in investigating crime and apprehending suspects." *Id.,* at 707 (Stewart, J., dissenting). Preventing flight is not a special governmental interest— it is indistinguishable from the ordinary interest in apprehending suspects. Similarly, the interest in inducing residents to open locked doors or containers is nothing more than the ordinary interest in investigating crime. That *Summers* detentions aid police in uncovering evidence and nabbing criminals does not distinguish them from the mine run of seizures unsupported by probable cause, which the Fourth Amendment generally proscribes.

\* \* \*

*Summers'* clear rule simplifies the task of officers who encounter occupants during a search. "[I]f police are to have workable rules, the balancing of the competing interests . . . 'must in large part be done on a categorical basis—not in an ad hoc, case-by-case fashion by individual police officers.'" *Id.,* at 705, n. 19 (quoting *Dunaway, supra,* at 219–220 (White, J., concurring)); see also *Arizona* v. *Gant,* 556 U. S. 332, 352–353 (2009) (SCALIA, J., concurring). But having received the advantage of *Sum-*

*mers*' categorical authorization to detain occupants inci-
dent to a search, the Government must take the bitter
with the sweet: Beyond *Summers*' spatial bounds, sei-
zures must comport with ordinary Fourth Amendment
principles.

# SUPREME COURT OF THE UNITED STATES

_____

No. 11–770

_____

## CHUNON L. BAILEY, AKA POLO, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[February 19, 2013]

JUSTICE BREYER, with whom JUSTICE THOMAS and JUSTICE ALITO join, dissenting.

Did the police act reasonably when they followed (for 0.7 miles), and then detained, two men who left a basement apartment as the police were about to enter to execute a search warrant for a gun? The Court of Appeals for the Second Circuit found that the police action was reasonable because (1) the "premises [were] subject to a valid search warrant," (2) the detained persons were "seen leaving those premises," and (3) "the detention [was] effected *as soon as reasonably practicable.*" 652 F. 3d 197, 208 (2011). In light of the risks of flight, of evidence destruction, and of human injury present in this and similar cases, I would follow the approach of the Court of Appeals and uphold its determination.

I

The Court of Appeals rested its holding upon well-supported District Court findings. The police stopped the men "at the earliest practicable location that was consistent with the safety and security of the officers and the public." 468 F. Supp. 2d 373, 380 (EDNY 2006). "[D]etention in open view outside the residence" would have subjected the officers "to additional dangers during the execution of the search," and it would have "poten-

tially frustrat[ed] the whole purpose of the search due to destruction of evidence." *Id.,* at 379.  It also could have

> "jeopardize[d] the search or endanger[ed] the lives of the officers . . . by allowing any other occupants inside the residence, who might see or hear the detention of the individual outside the residence as he was leaving, to have some time to (1) destroy or hide incriminating evidence just before the police are about to enter for the search; (2) flee through a back door or window; or (3) arm themselves in preparation for a violent confrontation with the police when they entered to conduct the search." *Id.,* at 380.

Moreover, the police stopped the men's car "at the first spot where they determined it was safe to conduct the stop," namely after the car, which had traveled a few blocks along busier streets and intersections, turned off on a quieter side road. *Id.,* at 379.

## II

The holding by the Court of Appeals is strongly supported by Supreme Court precedent.  In *Michigan* v. *Summers*, 452 U. S. 692 (1981), this Court held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Id.,* at 705 (footnote omitted).  And the similarities between *Summers* and this case are multiple.  In *Summers* the police had a valid warrant based on probable cause to search a house for drugs. *Id.,* at 693.  Here the police had a valid warrant based on probable cause to search a house for a gun and ammunition, believed to be used in multiple drug deals.  App. 16–18, 26.  In *Summers* the police, beginning to execute that warrant, were outside the house. 452 U. S., at 693.  Here the police, beginning to execute that warrant, were outside the house.  468 F. Supp. 2d, at

376.  In *Summers* the police then "encountered" an occupant of the house "descending the front steps."  452 U. S., at 693.  Here the police then encountered two occupants of the house ascending the back (basement) steps.  468 F. Supp. 2d, at 376; App. 43, 45.  In *Summers* the police entered the house soon after encountering that occupant. 452 U. S., at 693. Here the police entered the house soon after encountering those occupants (while other officers pursued them).  App. 49, 59–60.  In *Summers* the police detained the occupant while they engaged in their search. 452 U. S., at 693.  Here the police did the same.  468 F. Supp. 2d, at 377.

Thus, given *Summers,* only one question is open.  In *Summers* the police detained the occupant before he left "the sidewalk outside" of the house.  452 U. S., at 702, n. 16.  Here the police, for good reason, permitted the occupants to leave the premises and stopped them a few blocks from the house.  App. 48, 72, 86, 103.  (See Appendix, *infra*.)  The resulting question is whether this difference makes a constitutional difference.  In particular, which is the right constitutional line to demarcate where a *Summers* detention may be initiated?  Is it the Court's line, drawn at the "immediate vicinity" of the house?  *Ante,* at 12.  Or is it the Second Circuit's line, drawn on the basis of what is "reasonably practicable"?  652 F. 3d, at 207.  I agree, of course, with the concurrence that the question involves drawing a line of demarcation granting a categorical form of detention authority.  The question is simply *where* that line should be drawn.

## III

The Court in *Summers* rested its conclusion upon four considerations, each of which strongly supports the reasonableness of Bailey's detention, and each of which is as likely or more likely to support detention of an occupant of searchable premises detained "as soon as reasonably

practicable," 652 F. 3d, at 208, as it is to support the detention of an occupant detained "within the immediate vicinity" of those premises, *ante,* at 13. First, the Court in *Summers* found "[o]f prime importance . . . the fact that the police had obtained a warrant to search [the occupant's] house for contraband." 452 U. S., at 701. That fact meant that the *additional* detention-related "invasion of the privacy of the persons who resided there" was "less intrusive" than in a typical detention. *Ibid.* The same is true here and *always* true in this class of cases.

Second, the Court in *Summers* said that the detention was justified in part by "the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found." *Id.,* at 702. This factor, which *Summers* identifies as the "[m]ost obvious" rationale supporting detention, *ibid.,* will be present in all *Summers* detentions. *Summers* applies when police have a search warrant for contraband, *id.,* at 701, 705, n. 20, and any occupant departing a residence containing contraband will have incentive to flee once he encounters police. Indeed, since here the warrant itself described the possessor of the unlawful gun in terms that applied to both of the detained occupants, App. 46, the strength of this interest is equal to or greater than its strength in *Summers.*

Third, the Court in *Summers* said that the detention was justified in part by "the interest in minimizing the risk of harm to the officers." 452 U. S., at 702. The strength of this interest is greater here than in *Summers,* for here there was good reason, backed by probable cause, to believe that "[a] chrome .380 handgun, ammunition, [and] magazine clips" were on the premises. App. 17. As I discuss below, the interest in minimizing harm to officers is compromised by encouraging them to initiate searches before they are prepared to do so safely.

Fourth, the Court in *Summers* said that "the orderly completion of the search may be facilitated if the occu-

pants of the premises are present." 452 U. S., at 703. The strength of this interest here is equal to its strength in *Summers*. See, *e.g., United States* v. *Montieth*, 662 F. 3d 660, 663 (CA4 2011) (After being followed, detained, and returned to his home, Montieth helped officers find "marijuana, firearms, and cash").

The Court in *Summers* did not emphasize any other consideration.

## IV

There is, however, one further consideration, namely an administrative consideration. A bright line will sometimes help police more easily administer Fourth Amendment rules, while also helping to ensure that the police do not go beyond the bounds of the reasonable. The majority, however, offers no easily administered bright line. It describes its line as one drawn at "the immediate vicinity of the premises to be searched," to be determined by "a number of factors . . . including [but not limited to] the lawful limits of the premises, whether the occupant was within the line of sight of his dwelling, the ease of reentry from the occupant's location, and other relevant factors." *Ante,* at 13. The majority's line invites case-by-case litigation although, divorced as it is from interests that directly motivate the Fourth Amendment, it offers no clear case-by-case guidance.

In any event, as the lower courts pointed out, considerations related to the risks of flight, of evidence destruction, and of physical danger overcome any administrative advantages. Consider *why* the officers here waited until the occupants had left the block to stop them: They did so because the occupants might have been armed.

Indeed, even if those emerging occupants were not armed (and even if the police knew it), those emerging occupants might have seen the officers outside the house. And they might have alerted others inside the house

where, as we now know (and the officers had probable cause to believe), there was a gun lying on the floor in plain view. App. 202. Suppose those inside the house, once alerted, had tried to flee with the evidence. Suppose they had destroyed the evidence. Suppose that one of them had picked up the gun and fired when the officers entered. Suppose that an individual inside the house (perhaps under the influence of drugs) had grabbed the gun and begun to fire through the window, endangering police, neighbors, or families passing by. See *id.*, at 26 (informant describing gun's relation to drugs in the house).

Considerations of this kind reveal the dangers inherent in the majority's effort to draw a semi-bright line. And they show the need here and in this class of cases to test the constitutionality of the details of a search warrant's execution by taking more directly into account concerns related to safety, evidence, and flight, *i.e.,* the kinds of concerns more directly related to the Fourth Amendment's "ultimate touchstone of . . . reasonableness." *Kentucky* v. *King*, 563 U. S. ___, ___ (2011) (internal quotation marks omitted) (slip op., at 5). See *New York* v. *Class*, 475 U. S. 106, 116–117 (1986) (assessing Fourth Amendment reasonableness "[i]n light of the danger to the officers' safety"); *Pennsylvania* v. *Mimms*, 434 U. S. 106, 110 (1977) (*per curiam*) ("We think it too plain for argument that the State's proffered justification [for a stop]—the safety of the officer—is both legitimate and weighty"). See also *Maryland* v. *Buie*, 494 U. S. 325, 335, n. 2 (1990) (assessing Fourth Amendment reasonableness based on "the proper balance between officer safety and citizen privacy").

## V

The majority responds by pointing out that the police "are not required to stop" "a departing individual." *Ante,* at 8. Quite right. But that response is not convincing.

After all, the police do not know whether an emerging individual has seen an officer.  If he has, the risks are as I have described them, *e.g.,* that those inside may learn of imminent police entry and fire the gun.  In any event, the police may fear that they might be or have been spotted.  And they may consequently feel the need, under the majority's rule, to seize the emerging individual just before he leaves the "vicinity" but just too soon to guard against the danger of physical harm inherent in any search for guns.

The majority adds that, where the departing individuals themselves are dangerous, *Terry* v. *Ohio*, 392 U. S. 1 (1968), may authorize detention.  *Terry,* however, is irrelevant where the risks at issue are those of flight, destruction of evidence, or harm caused by those inside the house shooting at police or passersby.

Finally, the majority creates hypothetical specific examples of abuse, such as detention "10 miles away" from one's home at an airport and detention "five hours" after an occupant departs from the premises.  *Ante,* at 11, 8.  The seizures the majority imagines, however, strike me as red herrings, for I do not see how they could be justified as having taken place as soon as "reasonably practicable."  Indeed, the majority can find no such example in any actual case—even though almost every Court of Appeals to have considered the matter has taken the Second Circuit's approach.  See, *e.g., Montieth*, 662 F. 3d, at 666–669 ("as soon as practicable"); *United States* v. *Cavazos*, 288 F. 3d 706, 711–712 (CA5 2002) (rejecting "geographic proximity" as the test under *Summers*); *United States* v. *Cochran*, 939 F. 2d 337, 338–340 (CA6 1991) ("as soon as practicable"); *United States* v. *Bullock*, 632 F. 3d 1004, 1018–1021 (CA7 2011) ("as soon as practicable"); *United States* v. *Castro-Portillo*, 211 Fed. Appx. 715, 720–723 (CA10 2007) ("as soon as practicable"); *United States* v. *Sears*, 139 Fed. Appx. 162, 166 (CA11 2005) (*per curiam*) ("as soon as practicable").

While it is true that a hypothetical occupant whom police do not encounter until he is far from the searchable premises could engage some of the *Summers* rationales, that hypothetical occupant would do so significantly less often than would an occupant like Bailey. The difference is obvious: A hypothetical occupant 10 miles away from the searchable premises is less likely to learn of the search (and thus less likely to alert those inside or return to disrupt the search) than is an occupant like Bailey, who may perceive the police presence without alerting the police to the fact that he noticed them.

It is even less likely—indeed impossible—that the lower court's rule would (as the majority claims) permit "detaining anyone in the neighborhood," *ante,* at 9, for the rule explicitly applies only to those "*in the process of leaving* the premises," 652 F. 3d, at 206.

More fundamentally, *Summers* explained that detention incident to a search is permissible because, once police have obtained a search warrant, they "have an articulable basis for suspecting criminal activity." 452 U. S., at 699. That articulable, individualized suspicion attaches to the "particularly describ[ed] . . . place to be searched." U. S. Const., Amdt. 4. In turn, the connection between individualized suspicion of that place and individualized suspicion of "an individual *in the process of leaving* the premises" is sufficiently tight to justify detention. 652 F. 3d, at 206. That connection dissipates when the individual is not actually leaving the premises where, according to a neutral magistrate, there is probable cause to believe contraband can be found, and the *Summers* justification therefore does not apply. Hence, *Summers* applies *only* where the connection between the searchable premises and the detained occupant is as tight as it is in cases like *Summers* and this one: In both, a departing occupant had just left his home and was merely turned around and escorted back there for the duration of a search.

BREYER, J., dissenting

\*     \*     \*

In sum, I believe that the majority has substituted a line based on indeterminate geography for a line based on realistic considerations related to basic Fourth Amendment concerns such as privacy, safety, evidence destruction, and flight.  In my view, these latter considerations should govern the Fourth Amendment determination at issue here.  I consequently dissent.

Appendix



Shown above, from right to left, is the path of
approximately 0.7 miles traveled by police as they
followed petitioner Bailey and his companion.