**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MERRITT L. SHARP III; CAROL SHARP, | No. 15-56146 |
| *Plaintiffs-Appellees*, | D.C. No. 8:14-cv-00331-AG-JPR |
| v. | |
| COUNTY OF ORANGE; RYAN ANDERSON; JEREMIAH PRESCOTT; ALEXANDRA FLORES; JUSTIN CHEVALIER; MARK VAN DE KREEKE; ANTON PEREYRA, | OPINION |
| *Defendants-Appellants.* | |

Appeal from the United States District Court
for the Central District of California
Andrew J. Guilford, District Judge, Presiding

Argued and Submitted April 3, 2017
Pasadena, California

Filed September 19, 2017

Before: David M. Ebel,[*] Milan D. Smith, Jr., and N. Randy
Smith, Circuit Judges.

Opinion by Judge Ebel
Dissent by Judge N.R. Smith

## SUMMARY[**]

### Qualified Immunity / 42 U.S.C. § 1983

The panel affirmed the district court's denial of qualified
immunity to sheriff deputies as to plaintiff Merritt L. Sharp
III's retaliation claim, as well as the denial of state-law
immunities on plaintiffs' state claims; reversed the denial of
qualified immunity on plaintiff Carol Sharp's retaliation
claim and Sharp III's claims for the seizure of his person, the
use of excessive force against him, and the search of his
person, as well as plaintiffs' shared claim concerning the
search of their home; and remanded for further proceedings.

The case arose out of the execution of an arrest warrant
for plaintiffs' son, Merritt L. Sharp IV, whom sheriff
deputies thought was residing in his parents' home. The
sheriffs mistakenly arrested, searched and detained Sharp
III, and searched the entire house.  Plaintiffs alleged

---

[*] The Honorable David M. Ebel, Senior Judge for the United States
Court of Appeals for the Tenth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It
has been prepared by court staff for the convenience of the reader.

violations of their constitutional rights under 42 U.S.C. § 1983, and several pendent California state law claims.

First, the panel addressed Sharp III's claims that the deputies unlawfully seized him in violation of the Fourth Amendment. Concerning the *initial* mistaken arrest of Sharp III on the front lawn and initial transfer to the patrol vehicle, the panel held that this initial arrest based on mistaken identity was constitutionally unreasonable, and thus illegal, but it did not violate clearly established law, and thus qualified immunity was warranted. Concerning the *subsequent* detention of Sharp III inside the patrol vehicle after the deputies discovered that he was not the warrant subject, the panel held that the categorical detention rule in *Michigan v. Summers*, 452 U.S. 692 (1981), did not apply to arrest warrants at issue in this case. Because there were no particular circumstances justifying Sharp III's detention after learning he was not the arrest-warrant subject, the panel concluded that detention was unconstitutional. The panel, further held, however, that the detention did not violate clearly established law because of the legal ambiguity existing at the time of the arrest as to whether the categorical *Summers* exception applied to arrest warrants. The panel concluded that qualified immunity should have been granted.

The panel next addressed Sharp III's claims that Deputy Anderson violated the Fourth Amendment by using excessive force when Sharp III was arrested. The panel held that while the degree of force here was significant, Deputy Anderson was entitled to qualified immunity because plaintiffs did not offer anything other than general legal propositions which cannot clearly establish that Deputy Anderson's particular conduct was unlawful.

Concerning Sharp III's assertion of a Fourth Amendment violation based on the search of his person during the initial arrest, the panel held that since the arrest was not clearly proscribed by established law, neither was the subsequent search. Accordingly, qualified immunity should have been granted.

The panel addressed the plaintiffs' assertion that the deputies' search of their residence violated the Fourth Amendment. The panel held that the officers reasonably believed that Sharp IV resided in plaintiffs' home. The panel further held that Sharp IV's probation condition requiring him to submit his property to suspicionless searches defeated plaintiffs' claims that the deputies exceeded the scope of the authorized search by looking in areas where Sharp IV would not be found. The panel also held that there was no established law clearly proscribing the deputies' reliance upon Sharp IV's probation condition for their search of the residence. For these two reasons, the panel concluded that qualified immunity was warranted on this claim.

Concerning Sharp III's First Amendment claim based on the deputies' alleged retaliation against him for being argumentative, the panel held that Sharp III suffered unconstitutional retaliation that was clearly proscribed by established law. The panel concluded that qualified immunity was properly denied.

The deputies asserted four immunities under California state law to plaintiffs' various state law claims. The panel held that two immunities – "discretionary" immunity under Cal. Gov. Code § 820.2 and "prosecutorial" immunity under Cal. Gov. Code § 821.6 – did not apply as a matter of law. The panel also held that the remaining two immunities – arrest-warrant immunity under Cal. Gov. Code § 43.55(a) and false-arrest immunity under Cal. Penal Code § 847(b) –

did not apply as a consequence of the panel's determination that the deputies' actions here were unreasonable. The panel concluded that the district court properly denied these immunities.

The panel held that the district court did not err in declining to award summary judgment to deputies not implicated in certain claims where the district court welcomed a motion to release specific defendants, but the deputies neglected to make one.

Judge N.R. Smith dissented in part. Judge N.R. Smith agreed with the majority that the deputies violated the Constitution when the deputies seized Sharp III, when the deputies used force against him, and when the deputies searched his person. Judge N.R. Smith disagreed whether the rights were "clearly established" at the time of the violation. He wrote that the majority failed to view the facts in the light most favorable to Sharp III when analyzing the Fourth Amendment claims, and consequently the majority improperly granted the deputies qualified immunity for their initial arrest of Sharp III, their use of excessive force against Sharp III, their subsequent search of Sharp III, and their continued arrest of Sharp III. Judge N.R. Smith would hold that Sharp III's Fourth Amendment claims stemming from these violations should go to trial along with Sharp III's claim of First Amendment retaliation.

## COUNSEL

Michael J. Rossiter (argued), Zachary M. Schwartz, and William L. Haluck, Koeller Nebeker Carlson & Haluck LLP, Irvine, California, for Defendants-Appellants.

Brenton Whitney Aitken Hands (argued) and Jerry L. Steering, Law Office of Jerry L. Steering, Newport Beach, California, for Plaintiffs-Appellees.

**OPINION**

EBEL, Circuit Judge:

This case arises out of the execution of an arrest warrant gone wrong. Plaintiffs Merritt L. Sharp III (Sharp III) and Carol Sharp (Carol) were in their home when several sheriff deputies arrived. The deputies had an arrest warrant for Plaintiffs' son Merritt L. Sharp IV (Sharp IV), whom they believed was residing in his parents' home. During the pursuit of Sharp IV, however, the deputies mistakenly arrested his father Sharp III, believing him to be the subject of the warrant. In the course of that arrest, one of the deputies forcefully restrained Sharp III and searched his person. After they discovered their mistake, the deputies still kept Sharp III handcuffed and locked in a patrol car while several of them searched Plaintiffs' home for Sharp IV, the true subject of the arrest warrant. They also removed Carol from the house and forced her to wait during the home search. Meanwhile, Sharp III was kept detained in the patrol car after one of the deputies told him that he was being too argumentative to be let out of the car during the search of his home. Plaintiffs testified that when they returned to their house, they discovered that the deputies had not just searched for their son in the home, but also had searched through bedroom drawers and kitchen cabinets without a search warrant.

Plaintiffs brought this lawsuit asserting violations of their constitutional rights under 42 U.S.C. § 1983, and also

raised several pendent claims under California law. On motion for summary judgment, Defendants raised various immunities from suit, including qualified immunity from the § 1983 claims and a handful of state-law immunities from the state claims.[1] The district court denied all immunities. In its view, the deputies violated clearly established law, thereby precluding qualified immunity, and the district court further held that the asserted state-law immunities were inapplicable as a matter of law and fact.

We AFFIRM in part and REVERSE in part. The district court properly denied qualified immunity on Sharp III's retaliation claim, and appropriately rejected all state-law immunities. However, the deputies are entitled to qualified immunity on Carol's retaliation claim and Sharp III's claims for the seizure of his person, the use of excessive force against him, and the search of his person, as well as Plaintiffs' shared claim concerning the search of their home. Although we conclude that much of this conduct was unconstitutional, we hold that qualified immunity was nevertheless warranted on these claims. Our conclusions are driven by recent Supreme Court pronouncements on qualified immunity and rest principally on the failure by Plaintiffs to identify sufficiently specific constitutional

---

[1] Along with individual sheriff deputies, Plaintiffs sued the County of Orange for allegedly maintaining constitutionally inadequate customs and policies that resulted in the deputies' unlawful conduct. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). The County sought summary judgment because the undisputed record evidence did not support liability under this theory. The district court agreed, awarded summary judgment to the County, and the Plaintiffs do not cross-appeal. Thus, the only issues on appeal concern the immunities asserted by the deputy sheriffs.

precedents to alert these deputies that some of their particular conduct was unlawful.

## I. BACKGROUND[2]

In August 2013, Sharp IV was released from state prison subject to conditions of probation. The conditions required him to "[s]ubmit [his] person and property . . . to search and seizure at any time of the day or night by any law enforcement officer . . . with or without a warrant, probable cause or reasonable suspicion." ER at 121. With no place to stay after his release, his parents, Sharp III and Carol, agreed to let him live in their home at 408 Camino Bandera. Thus, upon his release, Sharp IV informed the probation office of this address as his place of residence. In mid-September 2013, however, Sharp IV's parents kicked him out of their house. Carol then called their son's probation and parole officers and informed them that Sharp IV "no longer lived in [their] home." SER 255.

In September 2013, a California criminal court issued two arrest warrants for Sharp IV. The deputies decided to execute the warrants on the evening of October 2, 2013—a date on which Sharp IV, coincidentally, was present at the Camino Bandera residence to pick up some belongings.

Before executing the warrants, Deputy Prescott reviewed Sharp IV's two active arrest warrants, which indicated that Sharp IV was male, white, fifty-one years old, 180 pounds, between 5'11" and 6' tall, and resided at 408 Camino Bandera. He also reviewed Sharp IV's DMV records and

---

[2] Unless otherwise indicated, the following recited facts are not materially disputed. To the extent that there are genuine disputes of material fact in the record, we accept the facts most favorable to Plaintiffs in the context of Defendants' motion for summary judgment.

probation response form, which confirmed the same address of residence.  Finally, he checked Sharp IV's criminal records and learned that Sharp IV had previously committed violent crimes, including kidnapping, assault with a deadly weapon, and felony domestic violence.  After reviewing these materials, Deputy Prescott met Deputies Van De Kreeke and Chevalier in a parking lot near the Camino Bandera residence to formulate a plan.  Deputy Prescott showed them a packet of documents which included a photograph of Sharp IV and the arrest warrant listing the Camino Bandera residence as Sharp IV's address of record.

At around 11:00 p.m., October 2, 2013, the deputies arrived at the Camino Bandera residence.  Deputy Chevalier made his way to the backyard while Deputies Prescott and Van De Kreeke went to the front door.  At the front door, they placed a piece of tape over the peephole opening and knocked several times.  Sharp III looked through the peephole but could not see anything, so he flashed the front-porch light and confirmed that something was covering the peephole.  Around that time, Deputy Prescott reported that he saw a person in a black shirt peek through the blinds.

Deputy Chevalier then radioed that the subject was fleeing out the backyard: "[H]e's running out the back.  Foot pursuit . . . going to be heavily wooded bushes.  Male[,] white, 5'11", 180, wearing a *black shirt*, *tan pants*, white shoes."  ER 20 (emphasis added).  Deputies Prescott and Van De Kreeke rushed around the back of the residence to assist in the pursuit, but nobody could locate the subject.  Working their way through dense brush to find Sharp IV, the deputies arrived at a nearby golf course and spread out to cover more ground.  At 11:05 p.m., Deputy Prescott radioed to nearby officers to cover the Camino Bandera residence in case the subject doubled back to the house.  Deputy Chevalier added

a further warning shortly thereafter: "Be advised, he's prone to violence. Violent history towards law enforcement." ER 22. By this time Deputy Anderson, who was on patrol nearby and had heard these radio transmissions, began making his way to the Camino Bandera residence for back-up support.

Meanwhile, the deputies continued their search for Sharp IV on the golf course. While on the golf course, Deputy Prescott saw a man in the backyard of the Camino Bandera residence whom he believed may have been Sharp IV. Deputy Prescott reported that the man he saw was bald, wore a blue shirt, and had the same stature as Sharp III. According to Deputy Prescott, the man yelled something at the deputies, turned around, and re-entered the home through the backdoor.[3]

Deputy Prescott then radioed the group that the "[s]uspect's gonna be back in the house, just went in the back door." ER 31. Then he directed Deputy Anderson specifically, "I need you to go to the front of the house." ER 32. Deputy Anderson responded that he was en route. Believing that Sharp IV had re-entered the house, Deputies Prescott, Chevalier, and Van De Kreeke began making their way back to the residence.

---

[3] Deputy Prescott claimed he heard the person in the backyard yell, "You guys couldn't catch a cold." ER 23. The parties dispute the precise content of the statement. They further dispute whether Deputy Prescott could have even seen anyone in the backyard over the tall brush that would have obscured his view from the golf course. These factual disputes are not material to our review of the order denying summary judgment.

At around 11:13 p.m. Deputy Anderson, accompanied by Deputy Flores, arrived at the house. They had not seen a photograph of the warrant subject, nor did they know the subject's name. Deputy Anderson did, however, recall from an earlier radio transmission that "the suspect fleeing the residence [was] described as a white male wearing a *black shirt* and *tan pants*."[4]  SER 149 (emphasis added). The deputies also knew that the suspect was "last seen in the area of the house" and "may have r[u]n back into the house." SER 152.

As Deputies Anderson and Flores arrived at the scene, Sharp III—the suspect's father—walked out of the front door wearing a *light blue shirt* and *blue jeans*. As Sharp III walked off the front porch, Deputy Anderson admitted there was enough light to be able to approximate Sharp III's age. Although Defendants dispute this, Sharp III claims he was not yelling or acting belligerent at the time, but rather walked calmly toward the deputies. Despite the mismatched clothing and an alleged demeanor inconsistent with that of a fleeing suspect, Deputies Anderson and Flores began shouting commands with their weapons drawn: "Get down on the ground!" and "put your hands up!" ER 32.[5]

---

[4] Later in his deposition, Deputy Anderson stated that all he remembered was that the subject was "male" and "white"—nothing about the clothing. SER 152. However, on summary judgment we adopt the version of the facts most favorable to the non-moving parties, here Plaintiffs. We thus credit his earlier statement that he heard the fleeing suspect was wearing a black shirt and tan pants, rather than his later contradictory statement of ignorance regarding the suspect's clothing.

[5] Defendants point out that, before arresting Sharp III, Deputy Anderson asked Sharp III his name, to which he responded, "Merritt." ER 32. The warrant subject's first name was also Merritt, so Defendants

The deputies then placed Sharp III under arrest. In explaining their rationale for the arrest, Deputy Anderson stated: "I hadn't identified who he was and believed he may be the wanted person." ER 178. Deputy Flores, who was the supporting deputy on the scene rather than the deputy who physically conducted the arrest, further explained: "I didn't know who was coming out of the house, to be honest. . . . [I]t wasn't secured, so we were trying to just detain everybody[.]" SER 237. Nevertheless, despite their uncertainty, the deputies proceeded to arrest Sharp III.

In doing so, Deputy Anderson grabbed Sharp III's left arm, put it behind his back, "shove[d] it" upward toward his neck, and handcuffed his left wrist. ER 187. Deputy Anderson then conducted a search of Sharp III's person, instructing him to empty out his pockets on the front lawn. Finally, Deputy Anderson handcuffed Sharp III's right wrist, thereby fully restraining his arm movement. According to Sharp III, the handcuffs were "so tight that [he] still ha[s] scars on [his] wrists to this very day." SER 273.

At 11:15 p.m., Deputy Anderson placed Sharp III in the back of a patrol car. He asked for the arrestee's full name and birthday, to which Sharp III responded that his name was Merritt Llewellyn Sharp and that he was born on August 6, 1940—thereby making him seventy-three years old. For the next several minutes, Deputy Anderson attempted to match Sharp III's identity with outstanding warrants by running the

---

contend that the arresting deputies reasonably believed Sharp III was the warrant subject. But the arresting deputies *did not know* the warrant subject's name, so learning that Sharp III's first name was also Merritt did not corroborate their suspicion that Sharp III was the warrant subject.

information through a mobile computer, but this effort was delayed by low internet connectivity in the area.

At 11:19 p.m., several deputies went back to search the house pursuant to Sharp IV's probationary search condition. At the front door, however, they confronted Sharp III's wife, Carol, who informed them that they had arrested the wrong man, and that her son Sharp IV did not live there anymore. Realizing their mistake, the deputies began to question Sharp III about his son's whereabouts. Sharp III was angry and still restrained in the back of the patrol car, but he answered their questions. He disclaimed any awareness of his son's location, but told the deputies that his son had been in the house twenty minutes earlier.

At this time, the deputies did not release Sharp III. Instead, they kept him handcuffed and locked in the patrol car. Sharp III was furious and adamantly protested his detention, loudly swearing at the deputies and threatening to sue them. In response, Deputy Anderson told Sharp III: "*If you weren't being so argumentative, I'd probably just put you on the curb.*" SER 280.

The home search began at 11:28 p.m., during which time Carol was forced to wait on the front porch with Deputies Flores and Hudson. Plaintiffs claim that the search encompassed more than just a search for Sharp IV. Taking the facts as stated by Plaintiffs, Deputies Prescott, Chevalier, Van De Kreeke, and Pereyra entered the home and opened kitchen cabinet and pantry doors, removed the air-conditioning cover in the attic, and searched various drawers in Carol's own bedroom. When Carol was allowed back in the house, she discovered clothing flung on the floor in her bedroom closet. After the search concluded, Sharp III was released from the patrol car at 11:39 p.m. That means, even after the deputies discovered he was not the subject of the

arrest warrant, Sharp III was detained for about twenty minutes in the patrol car.

The morning after the incident, Plaintiffs went to an urgent care facility for treatment of Sharp III's shoulder, which had been causing him pain after Deputy Anderson yanked his left arm behind his back. Sharp III ultimately needed surgery to repair a torn rotator cuff.

Plaintiffs now assert violations of their constitutional rights under 42 U.S.C. § 1983, and several pendent claims under California state law. As for the federal claims which we address on appeal from denial of qualified immunity, Sharp III asserts violations of the Fourth Amendment based on the seizure of his person (including the initial mistaken arrest and the continuing detention in the patrol car), the search of his person, and the use of excessive force against him. He also brings a First Amendment retaliation claim based on the deputies' refusal to release him on account of his "argumentative" demeanor. Carol brings a similar retaliation claim based on her verbal protests about the deputies' treatment of her husband. Finally, Plaintiffs together bring a shared Fourth Amendment claim for the search of their home. As for California state-law claims, they assert various statutory and common-law violations arising out of the same conduct that is the subject of the federal claims. The deputies moved for summary judgment on the grounds that they were entitled to qualified immunity against the federal claims, and state-law immunities against the state claims. The district court denied summary judgment, thereby prompting this interlocutory appeal.[6]

---

[6] We have appellate jurisdiction because a district court's denial of qualified immunity is immediately appealable to the extent it turns on an

## II. DISCUSSION

We review *de novo* a district court's order on summary judgment, and we evaluate the evidence in the light most favorable to Plaintiffs, the non-movants. *See, e.g.*, *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). Qualified immunity is proper unless Plaintiffs establish that (1) the deputies committed a constitutional violation, and (2) the deputies' specific conduct violated "clearly established" federal law. *E.g.*, *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 788 (9th Cir. 2016).

### A. *Seizure of Sharp III*

Sharp III claims that the deputies unlawfully seized him in violation of the Fourth Amendment. There are two aspects to this seizure which we analyze separately: (1) the *initial* mistaken arrest of Sharp III in the front lawn and initial transfer to the patrol vehicle, and (2) his *subsequent* detention inside the patrol vehicle after the deputies discovered that he was not the warrant subject. These separate phases of Sharp III's allegedly unreasonable seizure require separate treatment because they implicate different Fourth Amendment principles.

The legality of the initial mistaken arrest—when the deputies mistakenly believed they had correctly apprehended the subject of the warrant—turns on the objective reasonableness of their belief that the man they arrested was in fact the warrant subject. There is no categorical authority to commit such an unreasonable

---

issue of law, *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985), and the denial of a state-law immunity from suit is also immediately appealable, *Liberal v. Estrada*, 632 F.3d 1064, 1075 (9th Cir. 2011).

mistake, so we analyze only the specific facts that confronted the deputies during the arrest.  However, after the deputies learned that Sharp III was not the true warrant subject, they returned to search for Sharp IV in the Camino Bandera residence.  At that moment, a new Fourth Amendment principle was potentially implicated for the continued detention of Sharp III.  Under *Michigan v. Summers*, irrespective of the exigencies of the particular circumstances, officers may categorically detain the occupant of a home while executing a *search warrant* in that home.  452 U.S. 692, 705 (1981).  These deputies rely on *Summers* to assert that they could continue to detain Sharp III—even after they knew he was not the subject of the arrest warrant—while they searched his home for Sharp IV, for the purpose of executing the arrest warrant.  The principal issue as to the validity of this claimed defense is whether *Summers*, which hinged critically on the distinct character of *search* warrants, applies also to *arrest* warrants.

### 1.  *Initial Arrest of Sharp III Based on Mistaken Identity*

Sharp III encountered Deputies Anderson and Flores when he walked out of his front door.  At gun point, the deputies ordered him to the ground and placed him under arrest because he "may" have been the subject of the warrant. ER 178.  But the deputies were wrong—Sharp III was the suspect's father.  We conclude that this initial arrest based on mistaken identity was constitutionally unreasonable, and thus illegal, but it did not violate clearly established law.  Qualified immunity was therefore warranted.

### a.  *The Initial Arrest Was Unconstitutional*

In a case of mistaken identity, "the question is whether the arresting officers had a good faith, reasonable belief that

the arrestee was the subject of the warrant." *Rivera v. Cty. of Los Angeles*, 745 F.3d 384, 389 (9th Cir. 2014); *accord Hill v. California*, 401 U.S. 797, 802 (1971) ("[W]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." (internal quotation marks omitted)).  The constitutionality of the arrest thus turns on the reasonableness of the deputies' mistake.

In this case, the mistake of identity was unreasonable.  At the outset, it is not clear that Deputies Anderson and Flores actually even formed a specific belief that Sharp III was the warrant subject.  Deputy Anderson testified that he "hadn't identified who [Sharp III] was and believed [Sharp III] may be the wanted person."  ER 178.  Deputy Flores said that she "didn't know who was coming out of the house, . . . so we were trying to just detain everybody[.]"  SER 237.  However, both deputies should have known that Sharp III was not the subject they heard described on the radio transmissions.  They had not been privy to all the information known by the other deputies who first encountered the fleeing suspect.  All they knew was what they heard from the other deputies on the scene, who reported that the fleeing suspect (and reported subject of the arrest warrant) was wearing a black shirt and tan pants.  But Sharp III was wearing completely different clothing—a light blue shirt and blue jeans.  What is more, when they encountered Sharp III, he was walking toward them, rather than fleeing like the described suspect.

Defendants counter that it was nighttime and the situation was dynamic and evolving, but that does not give officers the license to arrest anyone near the scene of a fleeing suspect.  It was thus unreasonable for Deputies Anderson and Flores to conclude that Sharp III was the

subject of the arrest warrant.  The initial arrest of Sharp III therefore violated the Fourth Amendment.

### b.   The Violation Was Not Clearly Established

Although unconstitutional, the arrest was not clearly proscribed by established federal law.  The Supreme Court has repeatedly instructed that we examine "whether the violative nature of *particular* conduct is clearly established" by controlling precedent, not whether the conduct violates a general principle of law.  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).    Therefore, while *Hill v. California*, 401 U.S. 797, 802 (1971), and *Rivera v. County of Los Angeles*, 745 F.3d 384, 389 (9th Cir. 2014), establish a general rule that an unreasonable mistake of identity renders an arrest unconstitutional, we cannot simply apply that general rule to the facts of this case.

Except in the rare case of an "obvious" instance of constitutional misconduct (which is not presented here), Plaintiffs must "*identify a case* where an officer acting under similar circumstances as [defendants] was held to have violated the Fourth Amendment." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (emphasis added).  In other words, Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* deputies *in this case* that *their particular conduct* was unlawful.  To achieve that kind of notice, the prior precedent must be "controlling"—from the Ninth Circuit or Supreme Court— or otherwise be embraced by a "consensus" of courts outside the relevant jurisdiction. *Wilson v. Layne*, 526 U.S. 603, 617 (1999).

Plaintiffs offer only one controlling case that they believe meets this standard, *United States v. Delgadillo-*

*Velasquez*, 856 F.2d 1292 (9th Cir. 1988), but we reject it as too dissimilar on its facts. In that case, officers had an "untested tip" about a known drug dealer, a printout of his physical description, a twenty-year-old photograph of the fugitive, and his apartment address. *Id.* at 1294, 1296. The officers conducted surveillance of the apartment building over two days and observed an apparent drug transaction made outside the building by a Latin male whose appearance did not match the photograph. *Id.* at 1294. The officers then arrested that Latin male, but he ultimately was not the suspect they were looking for. We concluded that the officers lacked probable cause to make the arrest, and we rejected the mistake-of-identity defense because "they had no reason to believe" the arrestee was their suspect. *Id.* at 1297.

Our case differs materially from *Delgadillo-Velasquez.* In particular, the deputies here arrived late on the scene and understood the situation to be dynamic and evolving, with a fleeing suspect who was prone to act violently against law enforcement. The need to act quickly and decisively—even if mistakenly—was thus greater here than it was in *Delgadillo-Velasquez.* Further, in *Delgadillo-Velasquez*, the arresting officers had a photograph of the suspect that did not match the arrestee, whereas in our case Deputies Anderson and Flores had never seen a picture of the warrant subject and had only heard a general description of his clothing which was received under fleeting and stressful circumstances. Thus, *Delgadillo-Velasquez* does not clearly establish that the deputies in our case violated the Fourth Amendment.

It is true that in a sufficiently "obvious" case of constitutional misconduct, we do not require a precise factual analogue in our judicial precedents. *Brosseau v.*

*Haugen*, 543 U.S. 194, 199 (2004) (per curiam) ("[I]n an obvious case, [highly generalized] standards can 'clearly establish' the answer, even without a body of relevant case law."); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."); *United States v. Lanier*, 520 U.S. 259, 271 (1997) ("[I]n [some] instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful[.]" (internal quotation marks and alteration omitted)).[7]

But this obviousness principle, an exception to the specific-case requirement, is especially problematic in the Fourth-Amendment context. When a violation is obvious enough to override the necessity of a specific factual analogue, we mean to say that it is almost *always* wrong for an officer in those circumstances to act as he did. But that kind of categorical statement is particularly hard to make when officers encounter suspects every day in never-before-seen ways. There are countless confrontations involving officers that yield endless permutations of outcomes and responses. So the obviousness principle has real limits when it comes to the Fourth Amendment. *See Mullenix*, 136 S. Ct. at 308 (The legal rule's "specificity is especially important

---

[7] As one of our sibling circuits explained: "[S]ome things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing. Indeed, it would be remarkable if the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt." *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082-83 (10th Cir. 2015).

in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." (internal quotation marks and alteration omitted)).

With these observations in mind, we find this is not "one of those rare cases" in which a violation was so "obvious" that qualified immunity does not apply "even without a case directly on point." *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 455 (9th Cir. 2013). After all, Deputy Prescott had some basis to believe that Sharp III has reentered the house and may have tried to exit the front door since he would have known that the officers had the back exit covered. Thus, Deputy Prescott's instructions to Deputies Anderson and Flores to "go to the front of the house" could be construed by Deputy Anderson and Deputy Flores as an informed advisement that Deputy Prescott thought the suspect Sharp IV was at imminent risk of exiting the front of the house. ER 32. Deputies Anderson and Flores also had heard on the radio that the fleeing suspect had a history of violence toward law enforcement. Further, the deputies may have felt an acute need to apprehend the subject without verifying his identity based on their perception that the suspect had fled from the other deputies just minutes earlier. Finally, the arresting deputies here had never seen a picture of the warrant subject or even a detailed physical description of him other than the generalized reference to the fleeing suspect's clothes, transmitted over the radio under fleeting and stressful circumstances. These factors make this a non-obvious constitutional violation, and thus we require a specific precedent or principle that would have alerted Deputies Anderson and Flores that their specific conduct, or at least conduct more closely analogous to their own, was unlawful. Finding none, we conclude they were entitled to

qualified immunity as to the initial arrest based on mistaken identity.

## 2. *The Subsequent Detention of Sharp III in Patrol Vehicle Was Unconstitutional*

The deputies subsequently detained Sharp III's in the patrol car *after* they discovered that he was not the warrant subject. Defendants contend that, under the rule of *Michigan v. Summers*, 452 U.S. 692 (1981), officers have the categorical authority to detain a home occupant in the immediate vicinity of the home while executing an *arrest* warrant for a different subject in the home. But *Summers* involved a *search* warrant, which is meaningfully different from an arrest warrant. We hold that the categorical detention rule announced in *Summers* does not apply to arrest warrants, and because there were no particular circumstances justifying Sharp III's detention after learning he was not the arrest-warrant subject, we conclude that detention was unconstitutional as well. However, once again, it did not violate clearly established law because of the legal ambiguity existing at the time of the arrest as to whether the categorical *Summers* exception applied to arrest warrants. Thus, qualified immunity should have been granted.

## a. **Sharp III's Detention Cannot Be Justified By an Extension of** Michigan v. Summers *to Arrest Warrants*

We first analyze whether *Summers* gives law enforcement the categorical authority to detain home occupants incident to the execution of an *arrest warrant*. After concluding that such categorical authority does not extend to arrest warrants, we next examine whether, in the particular circumstances of this case, it was constitutionally

reasonable to detain Sharp III after realizing he was not the subject of the arrest warrant.

### i. *Categorical Detention Authority Under Summers*

It is established that a warrant to *search* a home "implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Summers*, 452 U.S. at 705. As Justice Scalia described it, the *Summers* detention authority "is not the Government's right; it is an exception—justified by necessity—to a rule that would otherwise render the seizure unlawful." *Bailey v. United States*, 568 U.S. 186, 204 (2013) (Scalia, J., concurring) (internal quotation marks and citation omitted). Moreover, this exception is categorical—it does not depend on the specific circumstances in a particular case, *see Muehler v. Mena*, 544 U.S. 93, 98 (2005), although it is "limited to the immediate vicinity of the premises" in question, *Bailey*, 568 U.S. at 199; *see id.* at 194, 201 (finding the *Summers* exception inapplicable because the occupant was detained a mile away from the home and thus was not within the immediate vicinity of the searched premises). We hold that the *Summers* exception, which hinged critically on the distinct nature of a search warrant, does not extend to arrest warrants.

Search warrants and arrest warrants are meaningfully different because they protect different Fourth Amendment interests. *See Steagald v. United States*, 451 U.S. 204, 212–13 (1981) (finding that an arrest warrant is not sufficient to enter a third party's home to arrest a subject, and that a

separate search warrant must be obtained for that purpose).[8] So it is not appropriate to assume that the rules of search warrants automatically apply to those of arrest warrants. We therefore conduct an independent analysis to determine whether the *Summers* rule encompasses arrest warrants.

In deciding the scope of this rule, we examine the original justifications outlined by the Supreme Court in announcing the rule in the first place. Those justifications were three-fold: (1) the detention of occupants whose home is already the subject of a search warrant only "minimally" inflicts an "incremental" intrusion on their rights, *Summers*, 452 U.S. at 701–02; (2) the search warrant itself implies that someone in the home may have committed a crime, thereby making it constitutionally reasonable to detain the occupants, *id.* at 703–04; and (3) the police have substantial interests in detaining occupants while the search is conducted, *id.* at 702–03. These reasons do not apply with the same force to arrest warrants. We assess each in turn.

First, because an arrest warrant targets a *person*, rather than a dwelling, detaining an occupant who is not the subject of the warrant inflicts an entirely separate Fourth Amendment injury on an entirely separate person—it is not a minimal or "incremental" intrusion because the arrest injured a different person than the subject of the warrant.

---

[8] Search warrants safeguard the *privacy* interest in the home by requiring officers to secure a judicial determination of probable cause that incriminating evidence would be found therein. *Steagald*, 451 U.S. at 212-13. By contrast, arrest warrants protect a person's *liberty* interest—the interest in not being unreasonably seized while in his home—by subjecting the officers' probable-cause determination to judicial approval. *Id.*

Second, arrest warrants do not imply that someone other than the subject of the warrant is guilty of a crime. In fact, the Supreme Court recognized this very principle in *Maryland v. Buie*: A "*search warrant* implie[s] a judicial determination that police had probable cause to believe that someone in the home was committing a crime[,]" whereas "the existence of [an] *arrest warrant* implies nothing about whether dangerous third parties will be found in the arrestee's house." 494 U.S. 325, 334 n.2 (1990) (emphasis added) (rejecting the State's argument that an "arrest warrant carrie[s] with it the authority to search for persons who could interfere with the [in-home] arrest").

Third, the interests of law enforcement in detaining occupants during a search (mostly) do not apply to the execution of an arrest warrant. The *Summers* Court articulated three such interests: (1) "preventing flight in the event that incriminating evidence is found"; (2) facilitating "the orderly completion of the search" as detainees' "self-interest may induce them to open locked doors or locked containers to avoid the use of force"; and (3) "minimizing the risk of harm to the officers." *Summers*, 452 U.S. at 702–03. With the exception of the final factor, these considerations simply do not apply with the same force to arrest warrants.

The first interest—prevention of flight in the event that incriminating evidence is found—is wholly inapplicable to the arrest-warrant context. An occupant might be expected to flee when the police find contraband during the execution of a search warrant. By contrast, an occupant who is not the subject of an arrest warrant is not likely to be arrested himself when the warrant is executed. So there is no real flight risk in the arrest-warrant context.

The second interest—the orderly completion of the search—is also inapposite. The essence of this rationale is that the occupant can help the police conduct the search by opening locked doors, but unless the subject of the arrest warrant is behind a locked door and the co-occupant has a key, this does not apply to arrest warrants.

The third interest—officer safety—is admittedly sometimes present in the arrest-warrant context as well. After all, co-occupants might frustrate the arrest of a family member or retaliate against officers if not properly restrained. But this lone interest cannot be enough to give officers the categorical power to detain home occupants during the execution of an arrest warrant *irrespective* of whether such a threat actually exists. The *Summers* Court relied on much more than that to give officers the "far-reaching authority" they now have to execute search warrants, *Bailey v. United States*, 133 S. Ct. 1031, 1039 (2013), so reliance on this factor alone is insufficient to extend the *Summers* rule—a rule of categorical authority—to arrest warrants.

Our decision in *United States v. Enslin*, 327 F.3d 788 (9th Cir. 2003), is not to the contrary. In that case, we upheld a "*de minimis*" seizure of a home occupant (requiring only that he show his hands to an officer) during the in-home execution of an arrest warrant for a different person. *Id.* at 795–98. While we cited *Summers* for the general proposition that risk to officer safety is minimized when officers take control of a situation, our holding in *Enslin* was predicated on a fact-specific reasonableness determination—balancing the seriousness of the intrusion against the interest in preserving officer safety in that particular case. *Id.* at 796–97. Such a fact-bound inquiry would not have been undertaken if the court had extended

the categorical *Summers* rule to the arrest-warrant context. Thus, *Enslin* does not compel a contrary holding in this case. Officers do not have the *categorical* authority to detain co-occupants of a home incident to the in-home execution of an arrest warrant.

That does not mean, however, that such a detention would never be authorized under the particular circumstances confronting an officer. Declining to extend the categorical *Summers* rule to arrest warrants does not leave officers defenseless when entering a home to execute an arrest warrant. There will surely be circumstances when detention of persons on, or immediately near, the premises will be objectively reasonable. After all, entry into a home for the purpose of arresting an occupant can be a dangerous effort, and officers ought to have reasonable tools at their disposal to take command of the situation to protect their own safety and the safety of others. *See Summers*, 452 U.S. at 702–03 ("The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation."). Those tools might include detention of occupants to stabilize the situation while searching for the subject of an arrest warrant or conducting a lawful protective sweep of the premises.

But as we explain, the deputies in *this* case were not presented with anything remotely near the circumstances needed to justify the detention of Sharp III.

> ii. *Whether the Detention of Sharp III Was Reasonable Under the Specific Circumstances Confronting the Deputies*

Defendants contend that, in these particular circumstances, Sharp III's detention was reasonably necessary to keep him from interfering with the search for

Sharp IV in the house.  But construing the facts in Plaintiffs' favor, we find no evidence to support that inference other than the unsupported speculation that an irritated father might intervene in a police effort to apprehend his son.  We decline to indulge such naked conjecture, especially because Sharp III was not engaged in any such disruptive activity at the time of the arrest.  He was walking toward the officers in an apparently compliant manner.  Sharp III's subsequent frustration is best understood as a reaction to the deputies' mistake in arresting him and his ongoing confinement in a patrol car. With no categorical authority to detain Sharp III under *Summers*, and no circumstance-specific authority to confine him either, the deputies have no more legal legs to stand on.  We thus find this patrol-car detention unconstitutional.

### b.  *The Violation Was Not Clearly Established*

Although there was no constitutional authority to detain Sharp III in the patrol car after discovering he was not the subject of the warrant, that particular detention was not clearly proscribed by established law.  Except when there is an "obvious" instance of constitutional misconduct, Plaintiffs must "*identify a case* where an officer acting under *similar circumstances* as [defendants] was held to have violated the Fourth Amendment." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (emphasis added).  Simply put, there is no such controlling case here that would alert these officers to the proper scope of *Summers*.

In fact, non-binding case law could be perceived by a reasonable officer to point in the other direction.  We have held in an unpublished decision that the *Summers* exception does, in fact, extend to arrest warrants.  *Katzka v. Leong*, 11 F. App'x 854, 855–56 (9th Cir. 2001) (unpublished). Further, our published decision in *Enslin, although it does*

*not go so far as to apply the* Summers *categorical exception to arrest warrants,* could nevertheless provide some support to a reasonable officer in concluding that the *Summers* categorical exception does apply to arrest warrants. 327 F.3d at 795–98.  And finally, other federal courts of appeals have also indicated that the *Summers*' rationale might apply in the arrest-warrant context.  *See Gomez v. United States*, 601 F. App'x 841, 846–49 (11th Cir. 2015) (unpublished); *Cherrington v. Skeeter*, 344 F.3d 631, 638 (6th Cir. 2003).

To be sure, the Supreme Court limited the *Summers* exception—and did so unequivocally—to the execution of warrants in the "immediate premises" of a home, see Bailey, 568 U.S. at 194, 201 (finding that one mile away from the searched premises did not qualify as within the immediate vicinity), but that limitation does not answer the question whether the *Summers* exception extends to arrest warrants— and our case law on that question, as well as rulings from several other federal circuit courts, could lead reasonable persons to different conclusions.  Neither is there any contention here by Plaintiffs that Sharp III's seizure was not within the "immediate vicinity" of the Camino Bandera residence.

Plaintiffs have also failed to identify a case that pronounces a constitutional rule at a level of specificity sufficient to alert these deputies here that their conduct was unconstitutional in the specific circumstances they confronted.  Nor is this a sufficiently "obvious" case justifying departure from our requirement that there be some factually analogous judicial precedent.  Thus, qualified immunity should have been granted.

**B.** *Use of Excessive Force Against Sharp III*

Sharp III claims that Deputy Anderson violated the Fourth Amendment by using excessive force when Sharp III was arrested. Taking the facts as offered by Plaintiffs, Deputy Anderson yanked Sharp III's left arm behind his back—thereby causing a rotator-cuff tear which required surgery—and then applied handcuffs that were tight enough to break Sharp III's skin. While the degree of force here was significant, Deputy Anderson was entitled to qualified immunity because Plaintiffs have not offered anything other than general legal propositions which cannot clearly establish that Deputy Anderson's particular conduct was unlawful.

Plaintiffs contend that the use of force is unlawful because the arrest itself is unlawful. But that is not so. We have expressly held that claims for false arrest and excessive force are analytically distinct. *See, e.g. Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004) ("Because the excessive force and false arrest factual inquiries are distinct, establishing a lack of probable cause to make an arrest does not establish an excessive force claim, and vice-versa." (citing *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921–22 (9th Cir. 2001)). That is consistent with the Supreme Court's recent decision in *County of Los Angeles v. Mendez*, which instructed courts not to conflate the analysis for excessive-force claims with related Fourth Amendment claims. 137 S. Ct. 1539, 1547 (2017). Thus, our conclusion that the arrest here was unconstitutional does not predetermine the question of whether the quantum of force used was excessive.

Turning to the degree of force used, Plaintiffs point only to cases that establish the general framework for evaluating how much force is constitutionally excessive. *See, e.g.*,

*Graham v. Connor*, 490 U.S. 386, 395 (1989). But that is not enough to defeat a qualified-immunity defense. We are aware of no controlling constitutional principle or judicial precedent that is specific enough to alert Deputy Anderson that the degree of force he used in these circumstances was unreasonable. Thus, qualified immunity was warranted.

## C. *Search of Sharp III's Person*

Sharp III next asserts a Fourth Amendment violation based on the search of his person during the initial arrest. Police officers have the categorical authority to conduct a search of an arrestee's person incident to a lawful arrest. *See United States v. Robinson*, 414 U.S. 218, 235 (1973). Having concluded that the arrest was unconstitutional, the search too must be deemed unlawful. But as we noted earlier, the arrest was not clearly proscribed by established law, and neither is the subsequent search. Plaintiffs do not identify a single case that clearly establishes a search in these circumstances would be unconstitutional. Accordingly, qualified immunity should have been granted.

## D. *Search of Plaintiffs' Home*

Plaintiffs assert that the deputies' search of the Camino Bandera residence violated the Fourth Amendment for two principal reasons: the deputies (1) unlawfully entered the home to search for Sharp IV without a reasonable basis to believe that Sharp IV resided and was actually present therein; and (2) exceeded the scope of their authority to search the home for Sharp IV by searching in some areas— e.g., kitchen and bedroom drawers—wherein Sharp IV would not reasonably be found. We address each argument in turn.

1.  *Unlawful Entry Into the Home*

Plaintiffs first argue that the deputies unlawfully entered the home because they could not have reasonably believed that the subject of the arrest warrant, Sharp IV, resided in the home.  It is well settled that an arrest warrant authorizes the police to enter the warrant subject's home to execute the arrest of that subject when there is reason to believe he is within the home.  *See, e.g.*, *Payton v. New York*, 445 U.S. 573, 602–03 (1980).  When the home is owned by a third party, "an officer must have a *reasonable belief* that the suspect named in the arrest warrant *resides in the third party's home . . . .*"  *Watts v. Cty. of Sacramento*, 256 F.3d 886, 889–90 (9th Cir. 2001) (emphasis added); *see also Steagald v. United States*, 451 U.S. 204, 205–06 (1981) (absent consent or exigent circumstances, police officers may not enter the home of a third party to execute an arrest warrant for a non-resident).

We find the officers reasonably believed that Sharp IV resided in Plaintiffs' home, despite Carol's statement on the front porch that her son did not live there.  Sharp IV's probation response form, DMV records, and arrest warrants all confirmed that he lived at the Camino Bandera residence, and it was not unreasonable to rely on those official documents rather than Carol's contrary statement, made in the heat of a stressful moment, which could have reasonably been discounted as an effort to protect her son from capture.

2.  *Scope of the Search for Sharp IV*

Plaintiffs next contend that the scope of the search was excessively broad because the deputies searched in areas where Sharp IV could not reasonably be found.  The authority to search a home does not ordinarily extend to the search of areas where the subject of a warrant would not be

found.  *See United States v. Ross*, 456 U.S. 798, 820 (1982) ("A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found."). But a condition of probation that requires an offender to submit his property to suspicionless searches gives officers more latitude in searching the offender's property.  *See Samson v. California*, 547 U.S. 843, 846 (2006); *United States v. Knights*, 534 U.S. 112, 121 (2001).

Sharp IV's probation condition requiring him to submit his property to suspicionless searches defeats Plaintiffs' claim that the deputies exceeded the scope of the authorized search by looking in areas where Sharp IV would not be found.  This is the deputies' principal theory for why the scope of the search was justified, but Plaintiffs *make no argument* in response to this dispositive theory.  In any event, there is no established law clearly proscribing the deputies' reliance upon Sharp IV's probation condition for their search of the Camino Bandera residence.  For these two principal reasons, qualified immunity was warranted on this claim.

In two cases, the Supreme Court has upheld the search or seizure of a probationer or parolee against Fourth-Amendment attack.  In *United States v. Knights*, the Court held that merely reasonable suspicion, and not probable cause or even a warrant, was enough to search a dwelling belonging to a probationer who has accepted conditions similar those in this case.  534 U.S. at 121.  More recently, in *Samson v. California*, the Court held that no individualized suspicion at all is required to search the person of a parolee when he has accepted such conditions. 547 U.S. at 846.  In both of these cases, the Court based its conclusion on the fact that a probationer or parolee has a diminished expectation of privacy, especially when he

accepts probationary conditions that explicitly and unambiguously inform him of a police officer's authority to search his property. *Knights*, 534 U.S. at 119–20; *Samson*, 547 U.S. at 851–52.

Reliance on this line of authority to justify the broad search of Plaintiffs' home admittedly poses some difficult legal questions. For instance, does acceptance of a probationary search condition constitute "consent" to search the home; i.e., a complete waiver of Fourth Amendment rights?[9] Can the search condition diminish a co-occupant's reasonable expectation of privacy in his home or otherwise bind a co-occupant to the "consent" given by the probationer?[10] Even if so, in this case, did Carol's contemporaneous objection to the search revoke any "consent" that might have been attributed to her, or negate the possible diminution of her privacy expectation brought about by Sharp IV's search condition? Established law does not offer clear answers to these questions. Thus, we cannot say that the deputies' particular conduct here violated clearly established law.

Further, while it might be argued that the deputies' search in Plaintiffs' personal bedroom drawers was itself

---

[9] The Supreme Court has expressly left open this question in *Samson*, 547 U.S. at 852 n.3, and *Knights*, 534 U.S. at 118, choosing instead to resolve the issue on the ground that acceptance of a search condition diminishes the offender's reasonable expectation of privacy.

[10] Ordinarily, when a person consents to the search of a home shared by other residents, such consent authorizes the police to search common areas of that home, even if doing so intrudes on the privacy rights of co-residents who did not themselves consent to the search. *See United States v. Matlock*, 415 U.S. 164, 170-71 (1974).

beyond the permissible scope of Sharp IV's probationary condition because those areas would not reasonably contain Sharp IV's "property," Plaintiffs did not assert this contention on appeal and so necessarily have failed to carry their burden of showing a clearly established violation. Nevertheless, we are skeptical of the argument. It is not patently unreasonable for the police to expect probationers to hide contraband in non-obvious places. For these reasons, we cannot say that the scope of the deputies' search exceeded the lawful bounds of clearly established precedent.[11]

For these reasons, qualified immunity was warranted on this claim.

## E. *First Amendment Retaliation*

Sharp III asserts a First Amendment claim based on the deputies' alleged retaliation against him for being argumentative. To establish a retaliation claim, the evidence must show that (1) the officer's conduct "would chill or

---

[11] Plaintiffs argue that the search was unconstitutional under *Maryland v. Buie*, which held that officers executing an in-home arrest warrant can conduct a "protective sweep" without individualized suspicion only in areas "immediately adjoining the place of arrest." 494 U.S. 325, 333-34 (1990). For the purpose of protecting the safety of the arresting officers, *Buie* permits officers to make a quick scan for dangerous individuals that might be hiding in areas immediately next to the place of the arrest, *id.* at 327, but holds that officers need reasonable suspicion to search in spaces outside that immediately adjoining area. However, when there is no actual arrest—as in the case before us today—the issue of a home search incident to an arrest warrant under *Buie* never arises. Further, and more importantly, *Buie* did not involve a probationary search condition, so the single most important fact relied upon here to justify the search of Plaintiffs' home was not present in *Buie*. Thus, *Buie* is not controlling.

silence a person of ordinary firmness from future First Amendment activities," and (2) the officer's desire to chill speech was a "but-for cause" of the adverse action. *Skoog v. Cty. of Clackamas*, 469 F.3d 1221, 1231–32 (9th Cir. 2006) (internal quotation marks omitted). While in the patrol car, Sharp III was visibly angry at the deputies, swore at them, and threatened to sue them. In response, Deputy Anderson told him, "If you weren't being so argumentative, I'd probably just put you on the curb." SER 280 (emphasis omitted). We conclude that Sharp III suffered unconstitutional retaliation that was clearly proscribed by established law.

Defendants do not take issue with the first prong of the inquiry—that continued detention would "chill" someone from engaging in protected speech. So we assume without deciding that this element is satisfied. Instead, the deputies stake their defense entirely on the second prong of causation. They contend that Sharp III's belligerent demeanor was not a "but-for cause" of the continued detention. But Deputy Anderson's statement plainly belies that contention, as it is quite literally a statement of but-for causation: "*If you weren't* [exercising your First Amendment rights], *I'd probably* [change the current conditions of your detention]." SER 280. The causation element is thus met and so Deputy Anderson's conduct amounted to unconstitutional retaliation.

This violation was clearly established by *Ford v. City of Yakima*, 706 F.3d 1188 (9th Cir. 2013). In that case, a police officer pulled over a driver who was blasting loud music, and because the driver would not stop "running [his] mouth" and exhibited an uncooperative "attitude," the officer arrested him and booked him in jail—rather than merely issuing a citation. *Id.* at 1190–91. The officer repeated that he was

arresting the man because the man would not "shut up" and had "diarrhea of the mouth." *Id.* at 1191. On these facts, we found an unconstitutional retaliation. These facts are sufficiently analogous to the case before us to conclude that Deputy Anderson was on notice that his particular conduct was unconstitutional. Thus, qualified immunity was properly denied. [12]

## F. *State-Law Immunities*

In addition to their federal constitutional claims, Plaintiffs brought a litany of state-law claims, including an anti-retaliation claim under Cal. Civ. Code § 52.1, as well as common-law claims for false imprisonment, assault and battery, negligent infliction of emotional distress, and trespass. In defense, the deputies assert the following immunities under California state law: (1) "discretionary" immunity under Cal. Gov. Code § 820.2; (2) "prosecutorial" immunity under Cal. Gov. Code § 821.6; (3) arrest-warrant immunity under Cal. Gov. Code § 43.55(a); and (4) false-arrest immunity under Cal. Penal Code § 847(b). We hold that the first two asserted immunities do not apply as a matter

---

[12] In the district court, Carol (Sharp III's wife) also asserted a retaliation claim based on the deputies' threat to handcuff her "because of her verbal protests of their conduct toward her and her husband." ER 265. The district court found that Carol had offered evidence sufficient to defeat summary judgment on this claim, citing a statement that the deputies threatened to retaliate against Carol if Sharp III did not stop "going off on the deputy." SER 8. Putting aside whether Carol can assert a free-speech claim grounded in *someone else*'s protected speech, we find no record evidence that the deputies made this statement at all. In any event, Plaintiffs do not argue this claim on behalf of Carol on appeal. Instead they focus entirely on Sharp III's experience in the patrol car. We thus find that opposition to summary judgment on Carol's retaliation claim was waived.

of law, and the latter two do not apply as a consequence of our determination that the deputies' actions here were unreasonable. The district court therefore properly denied these immunities.

1. *Cal. Gov. Code § 820.2*

"As a matter of law, section 820.2 ['discretionary'] immunity does not apply to an officer's decision to detain or arrest a suspect."[13] *Liberal v. Estrada*, 632 F.3d 1064, 1084 (9th Cir. 2011). Nor would this immunity extend to any other police action in this case because Cal. Gov. Code § 820.2 covers only "policy" decisions made by a "coordinate branch[] of government," not "operational decision[s] by the police purporting to apply the law." *Id.* at 1084–85 (internal quotation marks omitted). The district court thus correctly denied discretionary immunity.

2. *Cal. Gov. Code § 821.6*

The "prosecutorial" immunity under Cal. Gov. Code § 821.6 does not apply because it is limited to malicious-prosecution claims.[14] In 1974, the California Supreme Court held that § 821.6 immunity does not extend beyond malicious-prosecution claims. *Sullivan v. Cty. of Los Angeles*, 527 P.2d 865, 870–71 (Cal. 1974). Since then,

---

[13] Cal. Gov. Code § 820.2 provides: "[A] public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."

[14] Cal. Gov. Code § 821.6 provides: "A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause."

intermediate appellate courts have expanded the immunity to investigative steps taken prior to a judicial proceeding, including action by police officers. *E.g.*, *Gillian v. City of San Marino*, 147 Cal. App. 4th 1033, 1048 (2007). But "[w]hen interpreting state law, a federal court is bound by the decision of the *highest* state court." *Hewitt v. Joyner*, 940 F.2d 1561, 1565 (9th Cir. 1991) (emphasis added) (internal quotation marks omitted). Thus, because California's highest court has not extended § 821.6 immunity to actions outside of malicious prosecution, this immunity does not apply here.

3. *Cal. Civ. Code § 43.55(a)*

The arrest-warrant immunity under Cal. Gov. Code § 43.55(a) shields officers from suit when executing an arrest warrant when they act with a "reasonable belief" that the arrestee is the subject of the warrant.[15] As we have already explained, however, the deputies *unreasonably* assumed that Sharp III was the warrant subject. This immunity therefore does not apply.

4. *Cal. Penal Code § 847(b)(1)*

The false-arrest immunity under Cal. Penal Code § 847(b)(1) protects officers from suit when they make an arrest that they had "reasonable cause" to believe was

---

[15] Cal. Civ. Code § 43.55(a) provides: "There shall be no liability on the part of, and no cause of action shall arise against, any peace officer who makes an arrest pursuant to a warrant of arrest regular upon its face if the peace officer in making the arrest acts without malice and in the *reasonable belief that the person arrested is the one referred to in the warrant*." (Emphasis added).

lawful.**[16]**  As with the previous immunity, our conclusion that the arresting deputies lacked such a reasonable belief precludes the application of state-law immunity under Cal. Penal Code § 847(b)(1).

## G. *Summary Judgment as to Other Deputies*

We finally address a contention made throughout Defendants' briefs that all deputies not implicated in certain claims should be awarded summary judgment as to those claims.  The district court welcomed a motion to release specific defendants on this ground, but the deputies neglected to make one.  We therefore do not fault the district court for declining to award summary judgment to certain defendants when it invited them to make a more particularized claim that they were not involved in some of the challenged actions.  We thus find no error in the district court's decision on this subject.

## III.  CONCLUSION

We **AFFIRM** the district court's denial of qualified immunity as to Sharp III's retaliation claim, as well as the denial of state-law immunities on all Plaintiffs' state claims. However, we **REVERSE** the denial of qualified immunity on Carol's retaliation claim, and Sharp III's claims for the seizure of his person, the use of excessive force against him, and the search of his person, as well as Plaintiffs' shared claim concerning the search of their home.  We **REMAND**

---

**[16]** Cal. Penal Code § 847(b)(1) provides: "There shall be no civil liability on the part of, and no cause of action shall arise against, any peace officer . . . for false arrest or false imprisonment arising out of any arrest under any of the following circumstances: [] The arrest was lawful, or the peace officer, at the time of the arrest, *had reasonable cause to believe the arrest was lawful*."  (Emphasis added).

to the district court for further proceedings consistent with this opinion.

---

N.R. SMITH, Circuit Judge, dissenting in part:

In resolving a claim of qualified immunity, "summary judgment is improper if, resolving all disputes of fact and credibility in favor of the party asserting the injury, (1) the facts adduced show that the officer's conduct violated a constitutional right, and (2) that right was "clearly established" at the time of the violation." *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 788 (9th Cir. 2016) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Applying this precedent here, we must first resolve all factual conflicts in favor of Sharp III. We need not discuss the first prong because the Majority concedes (and I agree) that the deputies violated the Constitution (a) when the deputies seized Sharp III, (b) when the deputies used force against him, and (c) when the deputies searched his person. Thus, we need only discuss the second prong of the analysis.

A right is clearly established if a reasonable officer would know that the alleged conduct violated the Constitution. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). An officer has fair warning that conduct violates the Constitution if the conduct is an obvious violation of constitutional principles or if a factually analogous case prohibits the conduct. *White v. Pauly*, 137 S. Ct. 548, 552 (2017). Because the Majority fails to view the facts in the light most favorable to Sharp III, they claim that the deputies' unconstitutional actions were not sufficiently egregious for the deputies to have fair warning that they were violating the Constitution. Resolving all disputes of fact and

credibility in favor of Sharp III, I must dissent. Let me explain.

## I.  Seizure of Sharp III

The parties and the Majority agree that the seizure of Sharp III must be analyzed in two parts: (1) the initial arrest of Sharp III, and (2) the continuation of the arrest in the patrol vehicle after the deputies learned that he was not the subject of the arrest warrant. I proceed accordingly.

### A. *The Initial Arrest of Sharp III was an Obvious Constitutional Violation*

It is axiomatic that a warrantless arrest requires probable cause. *E.g.*, *Michigan v. Summers*, 452 U.S. 692, 700 (1981). Indeed, our court's precedent makes it apparent to law enforcement officers that a warrantless arrest can be made only if probable cause exists. *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) ("Under the Fourth Amendment, a warrantless arrest requires probable cause."); *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1378 (9th Cir. 1990) ("If there is one irreducible minimum in our Fourth Amendment jurisprudence, it is that a police officer may not detain an individual simply on the basis of suspicion in the air."). Similarly, the *Summers* Court made it abundantly clear that there are virtually no exceptions to the probable cause requirement when it comes to arrests:

> The central importance of the probable-cause requirement to the protection of a citizen's privacy afforded by the Fourth Amendment's guarantees cannot be compromised [by removing the probable cause requirement for arrests]. The requirement of probable cause has roots that are deep in our history.

> Hostility to seizures based on mere suspicion was a prime motivation for the adoption of the Fourth Amendment, and decisions immediately after its adoption affirmed that common rumor or report, suspicion, or even 'strong reason to suspect' was not adequate to support a warrant for arrest. The familiar threshold standard of probable cause for Fourth Amendment seizures reflects the benefit of extensive experience accommodating the factors relevant to the 'reasonableness' requirement of the Fourth Amendment, and provides the relative simplicity and clarity necessary to the implementation of a workable rule.

> Although we refused in *Dunaway* to find an exception that would swallow the general rule, our opinion recognized that *some seizures significantly less intrusive than an arrest* have withstood scrutiny under the reasonableness standard embodied in the Fourth Amendment. In these cases the intrusion on the citizen's privacy was so much less severe than that involved in a traditional arrest that the opposing interests in crime prevention and detection and in the police officer's safety could support the seizure as reasonable.

*Summers*, 452 U.S. at 697–98. (emphasis added) (quotation marks and citations omitted). Following this reasoning, the Supreme Court concluded that exceptions are permissible only if they "are consistent with the general rule that every arrest, and every seizure having the essential attributes of a

formal arrest, is unreasonable unless it is supported by probable cause." *Id.* at 701. Thus, *Michigan v. Summers* makes it apparent to law enforcement officers that a warrantless arrest can be made only with probable cause.

Turning to the facts, the Majority writes that "it is not clear that Deputies Anderson and Flores actually even formed a specific belief that Sharp III was the warrant subject." I agree. In explaining the facts leading to Sharp III's arrest, Deputy Flores stated that she "didn't know who was coming out of the house, to be honest. . . . [I]t wasn't secured, so we were trying to just detain everybody[.]" In addition, Sharp III did not match the description of the suspect. Sharp III was significantly older than the suspect, was wearing different clothing than the suspect, and displayed a demeanor inconsistent with a fleeing suspect. Thus, it is not surprising that Deputy Anderson also admitted that he "hadn't identified who [Sharp III] was" and only believed that Sharp III "may be" the wanted person. These facts seem to make clear that the deputies did not actually mistake Sharp III for the fleeing suspect. Further, even if the facts are not clear, we must resolve any ambiguity in favor of Sharp III. *E.g., Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). These facts then require us to analyze this case based on the assumption that Deputies Anderson and Flores did not form a specific belief that Sharp III was the warrant subject, but arrested him simply because he was present at the scene. As a result, the deputies made a warrantless arrest.

Viewing the evidence in the light most favorable to Sharp III, it is obvious that the deputies arrested Sharp III without probable cause. The facts in this case do not come close to meeting the probable cause standard. In an effort to avoid that uncomfortable truth, the Majority ignores the

statements made by Deputies Anderson and Flores and analyzes this case as one of mistaken identity.[1] But that theory crumbles when we view the facts in the light most favorable to Sharp III. Since the deputies had fair warning that their conduct violated Sharp III's Fourth Amendment rights when they arrested him without probable cause, they are not entitled to qualified immunity. The District Court was right; this claim should go to trial.

## B. *The Continued Seizure of Sharp III was an Obvious Constitutional Violation*

As noted, it is obvious that, "[u]nder the Fourth Amendment, a warrantless arrest requires probable cause." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007). In addition, seizing a citizen without probable cause for exercising their First Amendment rights is an obvious violation of the Fourth Amendment. *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1377–78 (9th Cir. 1990). Viewing the evidence in the light most favorable to Sharp III, the deputies lacked probable cause to continue Sharp III's arrest; the deputies continued the arrest only because Sharp III exercised his First Amendment rights. Since the deputies had fair warning that this conduct violated Sharp

---

[1] A case of mistaken identity is not an exception to the probable cause requirement. "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed *by the person being arrested*." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (emphasis added) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Thus, an arrest warrant coupled with a reasonable belief that the person being arrested is the subject of the arrest warrant gives rise to probable cause to arrest that person. On the other hand, an arrest based on an unreasonable belief that the person being arrested is the subject of the arrest warrant offends the Fourth Amendment.

III's Fourth Amendment rights, they are not entitled to qualified immunity. The District Court was right; this claim should go to trial. Again, let me explain.

> 1. *Viewing the Evidence in the Light Most Favorable to Sharp III, the Deputies Continued Sharp III's Arrest in Retaliation for Exercising His First Amendment Rights*

The Majority recites these facts related to Sharp III's seizure *after the deputies realized he was not the subject of the arrest warrant*:

> At this time, the deputies did not release Sharp III. Instead, they kept him handcuffed and locked in the patrol car. Sharp III was furious and adamantly protested his detention, loudly swearing at the deputies and threatening to sue them. In response, Deputy Anderson told Sharp III: "*If you weren't being so argumentative, I'd probably just put you on the curb.*"

Based on Deputy Anderson's statement, the Majority concedes that the deputies failed to release Sharp III in retaliation for exercising his *First Amendment* rights. In contrast, when analyzing whether the continued detention violated Sharp III's Fourth Amendment rights, the Majority inexplicably ignores Deputy Anderson's statement. Instead, the Majority improperly concludes that the deputies may have reasonably but mistakenly believed that the exception in *Summers* applied to arrest warrants. However, the Majority's conclusion is possible only if we view the evidence in the light most favorable *to the deputies*. Thus, viewing the facts in the light most favorable to Sharp III, the

deputies continued Sharp III's arrest because he exercised his First Amendment rights.

2. *Continuing Sharp III's Seizure for Exercising His First Amendment Rights was an Obvious Violation of Sharp III's Fourth Amendment Rights*

Holding a suspect in custody for exercising his First Amendment rights is an obvious violation of the Fourth Amendment. Indeed, case law in our circuit compels this conclusion. In *Duran v. City of Douglas, Ariz.*, an officer detained the defendant for "making obscene gestures toward [the officer] and yelling profanities." *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1377 (9th Cir. 1990). The *Duran* court held that, "while police, no less than anyone else, may resent having obscene words and gestures directed at them, they may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment." *Id.* at 1378. Consequently, the court held that detaining an individual without probable cause for exercising First Amendment rights was an obvious violation of the Fourth Amendment. *Id.* The import of *Duran* is clear: the deputies committed a clearly established violation of the Fourth Amendment when they kept Sharp III in custody for exercising his First Amendment rights.[2] As a result, the second prong of the qualified immunity analysis does not provide immunity to the deputies.

---

[2] *Duran* provided sufficient notice to the deputies that their conduct was a violation of the Fourth Amendment. Thus, in addition to being an "obvious" violation, the violation was clearly established by a factually analogous case.

### 3. *The Deputies Committed an Obvious Violation of Sharp III's Fourth Amendment Rights Even if Summers Applied to Arrest Warrants*

The deputies claim that they are entitled to qualified immunity, because it was not clearly established (at the time of Sharp III's detention) that *Summers* did not apply to arrest warrants. The Majority agrees that this legal principle was not clearly established prior to this case. I disagree.**[3]** However, even if the deputies could have believed that the *Summers* exception applied to arrest warrants, *Summers* unequivocally proscribed the continuation of Sharp III's arrest.

The court in *Summers* concluded that a valid search warrant "implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Summers*, 452 U.S. at 705. However, *Summers* made it abundantly clear that this exception does not apply to arrests. *Id.* at 697–98 "The central importance of the probable-cause requirement to the protection of a citizen's privacy afforded by the Fourth Amendment's guarantees cannot be compromised [by removing the probable cause

---

**[3]** Unless there is a specific exception, the general Fourth Amendment rules apply. *See Summers*, 452 U.S. at 697-98. The *Summers* Court created such an exception for brief detentions made during the execution of a search warrant. However, by nature of being an exception, it applies only to those specific circumstances. Otherwise, the exception would swallow the general rule. Thus, a law enforcement officer cannot commit a Fourth Amendment violation and hope that a court will create or extend an exception covering that violation. The Majority's reasoning would lead to the conclusion that there can never be a clearly established violation of the Fourth Amendment absent a factually analogous case; officers could always argue that they thought a court would create or extend an exception that covered their conduct.

requirement for arrests].” *Id.* at 697. In fact, the Court’s reasoning was explicitly based on the fact that the detention permitted under the exception would be “significantly less intrusive than an arrest.” *Id.*

In this case, the Majority agrees Sharp III was arrested, so the exception in *Summers* could never apply. While a mere detention can turn into a de facto arrest, *United States v. Baron*, 860 F.2d 911, 914 (9th Cir. 1988), the Majority does not go there. Further, I am aware of no case in which an arrest turned into a mere detention.[4] Consequently, Sharp III continued to be under arrest during his subsequent seizure in the patrol vehicle.  Thus, *Summers*, even if it applied to arrest warrants, could never justify Sharp III’s continued seizure. Since the language in *Summers* is categorical and clear, any reasonable officer would know this.

## II.  Search of Sharp III’s Person

“[E]xcept in certain carefully defined classes of cases, a search of private property without proper consent is ‘unreasonable’ unless it has been authorized by a valid search warrant.”  *Camara v. Mun. Court of City & Cty. of San Francisco*, 387 U.S. 523, 528–29 (1967). It is obvious that no exception for a search made incident to an *unlawful*

---

[4] I do not mean to say that an arrest could never turn into a detention. However, the facts in this case do not support such a conclusion. Perhaps if the deputies had taken Sharp III out of the patrol car and explicitly informed him that he was not under arrest, the arrest would de-escalate into a detention. As it stands, it is difficult to imagine a scenario where a person is not under arrest when they are forcibly handcuffed and placed into the back of a patrol vehicle. *See United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir. 1990) (“There has been an arrest if, under the circumstances, a reasonable person would conclude that he was not free to leave after brief questioning.”).

arrest exists; therefore, the deputies had sufficient notice that an unlawful arrest would result in an unlawful search. Thus, the search made incident to Sharp III's unlawful arrest was an obvious violation of the Fourth Amendment's prohibition of unreasonable searches. Since the deputies had fair warning that the search violated Sharp III's Fourth Amendment rights, they are not entitled to qualified immunity. The District Court was right; this claim should go to trial.

### III.  Use of Excessive Force Against Sharp III

The Majority claims they are "aware of no controlling constitutional principle . . . that is specific enough to alert Deputy Anderson that the degree of force he used in these circumstances was unreasonable." Let's examine that premise.

The use of force by a law enforcement officer violates the Fourth Amendment if the force is unreasonable given all the "relevant circumstances." *Hammer v. Gross*, 932 F.2d 842, 846 (9th Cir. 1991). Analyzing whether the use of force is unreasonable involves three steps. "First, we must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.'" *Glenn v. Washington Cty.*, 673 F.3d 864, 871 (9th Cir. 2011) (quoting *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010)). "Second, we evaluate the government's interest in the use of force." *Id.* In doing so, we must consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Third, "we balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Glenn*, 678 F.3d

at 871 (quoting *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003)).**[5]**

Viewing the evidence in the light most favorable to Sharp III, the deputies used considerable force against Sharp III. The deputies arrested Sharp III at gun point and used enough force to tear his rotator cuff. On the other hand, he had committed no crime. Deputy Flores conceded that the deputies arrested Sharp III because "we were trying to just detain everybody[.]" Sharp III posed no immediate threat to the safety of the officers or others. Sharp III walked calmly toward the deputies and was fully compliant. He never resisted or attempted to evade arrest by flight. No reasonable officer would believe using force, let alone significant force, was lawful under these circumstances. None of the *Graham* factors were present. Since Deputy Anderson had fair warning that his use of force violated Sharp III's Fourth Amendment rights, he is not entitled to qualified immunity. The District Court was right; this claim should go to trial.

## IV. Conclusion

Contrary to precedent regarding qualified immunity, the Majority fails to view the facts in the light most favorable to Sharp III when analyzing these Fourth Amendment claims. Consequently, the Majority improperly grants the deputies qualified immunity for their initial arrest of Sharp III, their use of excessive force against Sharp III, their subsequent search of Sharp III, and their continued arrest of Sharp III. Instead, viewing the facts in the light most favorable to

---

**[5]** The Supreme Court recently cautioned that *Graham* does not "by [itself] create clearly established law *outside 'an obvious case.'*" *White*, 137 S. Ct. at 552 (emphasis added) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). This is an obvious case.

Sharp III, the deputies are not entitled to qualified immunity for any of these constitutional violations. Thus, Sharp III's Fourth Amendment claims stemming from these violations should go to trial right along with Sharp III's claim of First Amendment retaliation. I dissent.